## THE VOCO.

## THE GYPSUM PRINCE.

District Court, S. D. New York.
July 6, 1944.

Macklin, Brown, Lenahan & Speer, of New York City (Paul Speer and Leo F. Hanan, both of New York City, of counsel), for petitioner Socony Vacuum Transp. Co., Limited.

Barry, Wainwright, Thacher & Symmers, of New York City (Earle Farwell and Joseph M. Brush, both of New York City, of counsel), for Gypsum Packet Co., Limited.

Crowell & Rouse, of New York City (E. Curtis Rouse, of New York City, of counsel), for different claimants.

COXE, District Judge.

These cases grow out of a collision between the British steamships "Voco" and "Gypsum Prince" in the lower part of Delaware Bay, off Cape Henlopen, in the early morning of March 4, 1942. The "Voco" was at the time outbound from Marcus Hook, Pennsylvania, for New York, with a part cargo of petroleum products. The "Gypsum Prince" was inbound from Digby, Nova Scotia, for Philadelphia, with a full cargo of gypsum rock. As a result of the collision, the "Gypsum Prince" sank, the "Voco" sustained serious damage, and the master, chief officer and four members of the crew of the "Gypsum Prince" lost their lives.

The owners of the respective vessels have instituted limitation proceedings in this court, and in each of these proceedings claims have been asserted (1) by the vessel owners, (2) by two death claimants, and (3) by the pilot of the "Gypsum Prince" for loss of personal effects and damages. It has been stipulated by all parties that the vessel owners are entitled to limitation in the event that their respective vessels are held at fault.

The "Voco" is an oil burning steam tanker, with a single screw and a reciprocating engine; her length is 394.3 feet, her beam 50.3 feet and her full speed loaded 10½ knots. The bridge is located about 20 feet forward of midships, and had at the time of the collision an armored protection in the midship portion of the forepart of the bridge, which permitted walking across the bridge. In the front of this protection there was a steel plate with four slits, each six inches high and two feet long, which were on the line of the eye of a person standing on the bridge.

The "Gypsum Prince" was a steam vessel 347.8 feet long and 52.8 feet beam. Her normal full speed loaded was about 10 knots, and her bridge was located on the forward part of the vessel about 50 feet from the stem.

At the time of the collision it was still dark but the weather was clear with good visibility; the tide was flood with a strength of a knot or a knot and a half; and the wind was northwest, of an estimated force of 4 or 5. Both vessels were carrying proper navigation lights.

Because of war conditions the navigable channel at the entrance to Delaware Bay was restricted. The easterly side of the channel was marked by two lighted buoys, the outer or southern one being Buoy A, and the inner or northern one being Buoy B. On the western side of the channel was the Delaware Breakwater with the Harbor of Refuge Lighthouse at its southerly end, and Cape Henlopen further to the south. All vessels leaving or entering the Delaware river above Buoy B were

required to undergo a naval examination, which usually took place in the area between Buoy B and the breakwater. The channel between the breakwater and the line of the two buoys was about a mile and a half or two miles wide.

The navigation of the "Voco" as told by her own witnesses will first be considered. The vessel after leaving Marcus Hook proceeded down the Delaware river, and on the afternoon of March 3rd anchored above the upper or northerly light on the Delaware Breakwater. Ingram, the pilot, testified that the anchorage was about a mile above the upper breakwater light; he did not, however, take anchorage bearings, and did not know that any bearings were taken. Captain Blair, the master, said that anchorage bearings were taken, and these bearings, if correct, placed the vessel about a mile south of the position given by Ingram. The difference between the two positions is of no particular importance, and it will be sufficient for the present purpose merely to find that the anchorage was a short distance above the upper breakwater light.

The "Voco" started from her anchorage at 6:05 A. M. on March 4th, and proceeded slowly towards the place where the naval examination was expected to occur; she had a foremast light, two side lights, red and green, and a stern light. The engines were stopped at 6:24 to enable the Coast Guard vessel to come alongside and make the necessary naval examination. Ingram testified that in order to make a lee for that vessel, the heading of the "Voco" was changed about 45 degrees towards the breakwater, and that on this heading the Harbor of Refuge light was on the starboard bow. Roseman, the Coast Guard officer who conducted the examination, testifying as a witness for the "Gypsum Prince", said that the "Voco" made "close to a 90 degree turn", and that afterwards she was heading towards the Harbor of Refuge light. There was no good reason for a 90 degree turn, as the wind was strong northwest, and the "Voco" was on her way to sea. I, therefore, accept Ingram's testimony that the change was only about 45 degrees, and that it left the heading of the vessel with the Harbor of Refuge light on the starboard bow. The naval examination took about five minutes, and during that interval the "Voco" had some way. At the completion of the examination the vessel was about

at the bend in the breakwater, and approximately half a mile off.

When the naval examination was completed, the "Voco" went full speed ahead on a left wheel until the vessel steadied on a course of 157 degrees true. The engine room bell book shows the full ahead signal was received at 6:29, and Ingram testified that the vessel was about half a mile off the breakwater when she steadied on the 157 degrees course. There were on the bridge Captain Blair, the master, Ingram, the pilot, Billett, the chief officer, and a wheelsman. Patching, the boatswain, was standing lookout on the forecastle head.

There were two vessels proceeding outbound ahead of the "Voco". The first of these was the S/S "Yankee Sword", a bulk ore carrier loaded with coal. Three of the officers from that vessel testified on behalf of the "Voco". The second vessel was the S/S "Craigsmere", a cargo ship carrying coal. Two witnesses from the "Craigsmere" testified for the "Voco". Both of these vessels were ahead of the "Voco", and to her port. There were other outbound vessels following the "Voco". One of these was the S/S "Josephine Lawrence", a lumber vessel. The chief officer of that vessel also testified for the "Voco". The testimony of these various witnesses will be referred to later.

The "Voco" proceeded on course 157 for a few minutes when the "Gypsum Prince" was seen on the port bow showing her masthead light and her green light. Ingram said that the "Voco" was then a little above the Harbor of Refuge Lighthouse, with the "Gypsum Prince" about 2½ to 3 points on the port bow; he estimated the distance separating the two vessels at 2½ to 3 miles. Captain Blair said that the "Gypsum Prince" was about three points on the port bow, and about 2 miles away.

After an interval of about two minutes the "Voco" blew a one whistle signal to the "Gypsum Prince" and at the same time an order was given to the wheelsman to "starboard easy", which made "a slight change" in heading to starboard to allow the "Gypsum Prince" more room to pass port to port. The "Gypsum Prince" was then bearing about 2½ points on the port bow, and was about three quarters of a mile away. No answer to this one whistle signal was heard from the "Gypsum Prince", which appeared to be keeping on without any change of course or heading. About two minues later the "Voco" blew

a second one whistle signal to the "Gypsum Prince", which was then bearing about a point on the."Voco's" port bow, still showing her green light, and was about a quarter of a mile away.

Ingram testified that shortly after the "Voco's" second one whistle signal the "Gypsum Prince" answered with two blasts; the "Gypsum Prince" was then about half a point on the "Voco's" port bow and holding to her course. The helm of the "Voco" was thereupon put hard left and the engines slow ahead. Ingram and Captain Blair both testified that to have stopped and reversed at that time would have swung the bow of the "Voco" to starboard and right in the way of the "Gypsum Prince". Chief Officer Billett said on cross-examination that the slow ahead order of the "Voco" was given after the "Voco's" first one whistle signal, but he testified differently on direct, and the other evidence is clear that the order followed the two blasts from the "Gypsum Prince". Moreover, the slow ahead order is recorded in the engine room bell book at 6:44, or two minutes before the collision. Captain Blair, Chief Officer Billett and Patching were positive that the "Gypsum Prince's" signal was two blasts. Between the time of the "Voco's" first one whistle and her hard left helm the "Voco" had swung to starboard from a heading of 157 degrees true to 165 degrees true.

Ingram said that after the "hard left" and "slow ahead" orders, he was about "to blow the danger signal and answer with two whistles" when he noticed that the "Gypsum Prince" was altering her course to starboard; the "green light disappeared and his red light just swung across the bow". Captain Blair testified to the same effect. The rudder of the "Voco" was then immediately placed hard right, the engines full astern, and three whistle blasts were blown. The full astern order was at 6:45, and the collision at 6:46. The bow of the "Voco" struck the port side of the "Gypsum Prince" at an angle of about 75 degrees, about 30 feet aft of the bridge. The "Gypsum Prince" remained afloat for about 10 minutes, and sank about 1,000 feet east of the place of collision. The wreck is marked on the charts, and the position is described in a Coast Guard bulletin of March 11, 1942, as being 2525 yards 113½ degrees from the Harbor of Refuge Lighthouse.

The version of the collision given by the witnesses for the "Gypsum Prince". was materially different from that of the "Voco's" witnesses. Johnson, the pilot of the "Gypsum Prince", testified at the trial, and his account of the navigation of the "Gypsum Prince" finds little support either from the other witnesses for the "Gypsum Prince" or from the outside witnesses. Johnson testified that he boarded the "Gypsum Prince" about a mile to the southward of Buoy A. The vessel was then heading in a westerly direction towards Cape Henlopen. Captain Jones and Chief Officer Morgan were on the bridge, and Callahan, a seaman, was at the wheel. There was no lookout on the bow at any time after Johnson came on board.

When Johnson reached the bridge, he ordered the engines full speed ahead and the helm hard right. He said that, ordinarily, inbound vessels would proceed very close to Buoy A, and then steer up the bay, with the upper Buoy B "fine on the starboard bow"; he could not, however, proceed in that way on this occasion because two or three outbound vessels "nearly up to Buoy A, and "one right behind the other", were "directly in that path". The "Gypsum Prince" rounded Buoy A about half a mile off to starboard, and Johnson insisted that the outbound vessels were so close to the buoy that there was insufficient room to pass between them and the buoy. He accordingly blew two whistles to indicate that he would pass the the outbound vessels starboard to starboard, and then steered a course on Harbor of Refuge Lighthouse about a point on the port bow. Callahan, the wheelsman, did not agree that the course in the beginning was as stated by Johnson; he said that after he received the first hard right order he kept the white light "a little off the port bow"—"maybe three or four degrees off".

The "Voco" was first observed by the "Gypsum Prince" when Buoy A "was just abaft the beam". Johnson said that he then saw the red light, foremast light and after range light of the "Voco"; the red light was about ahead, and the vessel was heading towards the breakwater. About two minutes later the "Voco" drew closer to the Harbor of Refuge light, and seemed to be swinging around on a left rudder. Johnson thereupon blew a one whistle signal to the "Voco", and ordered the wheel of the "Gypsum Prince" "right easy, then.

midships and then steady", which he said effected a change in the heading of the vessel about a point or a point and a half to starboard. Callahan's testimony regarding this "right easy" order was that after it was given he was still steering with the white light and keeping over "another degree or two". No answer to the one whistle was made by the "Voco". The "Gypsum Prince" was proceeding at the time at a speed of about 9 knots, and Johnson knew that the "Voco" was "going to come down the bay".

The "Voco" continued on her left swing still showing her red light, and after an interval of four or five minutes Johnson blew "a prolonged blast of the whistle". Johnson said that this signal was a single blast of from six to eight seconds duration. Black, the chief engineer, who was off watch at the time, heard the whistle, and said it was so long that he thought "it might be stuck". After the whistle was blown, the "Voco" opened up her green light so that both red and green lights were visible; she was at the time about a point and a half or two points on the "Gypsum Prince's" bow. The engines of the "Gypsum Prince" were immediately stopped and the wheel put hard right. Johnson said that when he saw all of the lights on the "Voco" he realized that there would be a collision, and he ordered full speed ahead again and the wheel hard right. His idea was to get as· far away from the "Voco" as possible. The collision took place one or two minutes afterwards. The angle of collision was about 75 degrees. The "Gypsum Prince" was struck on the port side about 70 or 80 feet from the stem, and the "Voco" penetrated to the hatch coamings a distance of about eight feet from the ship's side. Johnson said he heard no whistle signals from any vessel prior to the collision.

The members of the crew of the "Gypsum Prince" who testified were Maloney, the second officer; Olsen, the second engineer; Clarke, a seaman who acted as lookout before the pilot came on board; Callahan, the wheelsman, and Black, the chief engineer. Maloney was off watch and asleep during the time the "Gypsum Prince" was proceeding up the bay, and knew nothing about the navigation. Olsen said that there was a full speed ahead signal at 6:07 or 6:08, and that the engines were at full speed ahead until 6:36, when a stop signal was received; about 15 seconds afterwards there was another full speed ahead order, followed 20 or 30 seconds later by the collision. Olsen did not notice any whistle signals. Clarke was underneath the forecastle head during the period after the pilot came on board, and was not asked about the whistles. Callahan said he heard whistles but did not recall what they were; he also testified about the helm orders as already indicated. Black heard only the "prolonged whistle" from the "Gypsum Prince", which he said was about five minutes before the collision.

The outside witnesses for the "Voco" strongly supported the "Voco's" version of the collision. The first of these outside witnesses were officers of the "Yankee Sword", which was the leading vessel proceeding down the bay ahead of the "Voco". These witnesses from the "Yankee Sword" were Captain Hardy, the master, Look, the first officer, and Vining, the third officer. All three testified that the "Yankee Sword" went down the bay on a course close to the center of the channel and parallel to the line of Buoys A and B; Hardy said that Buoy B was passed 1,200 to 1,500 feet off to port; Look said that the distance off the buoy was about two ships' lengths. These witnesses also said that when the "Yankee Sword" was north of Buoy A the "Gypsum Prince" was off to port showing her green light, and heading across the "Yankee Sword's" bow; they expected the vessels to pass port to port, but the "Yankee Sword" in order to avoid collision blew two whistles, put her helm hard left and swung sharply to port. The "Gypsum Prince" kept on across the "Yankee Sword's" bow, and, after the vessels passed, the "Yankee Sword" gradually worked back to her original course and rounded Buoy A about 400 or 500 feet off to port. Look and Vining said that a little later, and while the "Yankee Sword" was still north of Buoy A, they distinctly heard the two one-whistle signals of the "Voco" and the two whistle signal of the "Gypsum Prince". Vining's testimony with respect to the whistles was particularly impressive because he was looking astern after the "Gypsum Prince" passed; he accounted for his interest in following the movements of the "Gypsum Prince" by saying that the "Yankee Sword" "almost hit" the "Gypsum Prince", and he had in mind that the other outbound vessels "would possibly have the same trouble that we did".

In addition to the three witnesses from the "Yankee Sword" there were two witnesses from the "Craigsmere", which was the second outbound vessel proceeding astern of the "Yankee Sword" and a little ahead of the "Voco". These two witnesses were Nelson, acting first officer, and Atherton, the lookout on the vessel. Nelson testified that the "Craigsmere" passed Buoy B about three ships' lengths off, and was right behind the "Yankee Sword". He said that the "Gypsum Prince" crossed the bow of the "Craigsmere" as well as that of the "Yankee Sword". The nearest vessel astern was on the starboard quarter of the "Craigsmere" about "a half mile or more away". After the "Gypsum Prince" passed, he heard two one-whistle signals from one of the ships astern, followed by a two whistle signal of a "different tone" "from the starboard beam". Atherton, the lookout, corroborated the testimony of Nelson that the "Gypsum Prince" crossed ahead of the "Craigsmere", showing her green light.

The remaining witness who testified for the "Voco" was Murphy, the first officer of the "Josephine Lawrence", which was outbound astern of the "Voco". Murphy said that the "Voco" was directly ahead of the "Josephine Lawrence", and she did not appear "to change her course in any way". The "Josephine Lawrence" came up on the "Gypsum Prince" when she was "just awash" and passed between her and the "Voco". The "Josephine Lawrence" then stopped and launched a life boat in an effort to pick up survivors.

I accept the testimony of the "Voco's" witnesses with respect to the navigation of the vessel. According to these witnesses, the "Voco was about at the bend in the breakwater, approximately half a mile off, and heading with the Harbor of Refuge light on the starboard bow when the naval examination was completed. The vessel thereupon went full speed ahead on a left wheel until she steadied on a course of 157 degrees true. I do not think that the swing back from the previous change of about 45 degrees towards the breakwater required any wide turning movement, and I place the vessel still about half a mile off the breakwater when she steadied on the 157 degrees course. A few minutes later the "Gypsum Prince" was sighted on the port bow showing her masthead light and her green light. The "Voco" was then a little above the Harbor of Refuge Light-house. After an interval of about two minutes the "Voco" blew a one whistle signal, and at the same time made a slight change in the heading to starboard. The "Gypsum Prince" was then about three quarters of a mile away, bearing about 2½ points on the port bow, showing her green light, and keeping on her course diagonally across the channel. About two minutes later the "Voco" blew a second one whistle signal. The "Gypsum Prince" was then bearing about a point on the port bow, still showing her green light, and continuing on her course. The distance between the two vessels was at that time about a quarter of a mile. The blowing of these two one whistle signals by the "Voco" was clearly established not only by the "Voco's" witnesses but by three of the outside witnesses. The "Gypsum Prince" answered the "Voco's" second one whistle signal with two blasts and held to her course; she was then about half a point on the "Voco's" port bow. The "Voco's" helm was thereupon placed hard left and the engines slow ahead at 6:44. The change in the "Voco's" heading from the time of the first one whistle signal until the hard left helm was about 8 degrees to a heading of 165 degrees true. After the hard left and slow ahead orders, the "Gypsum Prince" was seen altering her course to starboard, and the helm of the "Voco" was immediately placed hard right, the engines full astern, and backing signals were blown. The full astern order was at 6:45 and the collision at 6:46. The collision occurred on the westerly side of the channel, and the "Gypsum Prince" sank about 1,000 feet east of the place of collision. The bow of the "Voco" struck the port side of the "Gypsum Prince" at an angle of about 75 degrees, about 30 feet aft of the bridge.

I make the following findings with respect to the navigation of the "Gypsum Prince": Johnson, the pilot, boarded the vessel about a mile to the southward of Buoy A. The vessel was then heading in a westerly direction towards Cape Henlopen. There was no lookout on the bow at any time after Johnson came on board. When Johnson reached the bridge he ordered the engines full speed ahead and the helm hard right. The usual course for inbound vessels to take was up the easterly side of the channel close to the line between Buoys A and B. The "Gypsum Prince" rounded Buoy A about half a mile

off to starboard and swung towards the easterly side of the channel. There were at the time two outbound vessels coming down the bay, well over towards the center of the channel, and proceeding parallel to the line of the two buoys. The leading one of these two vessels was the "Yankee Sword", with the "Craigsmere" following a short distance behind. When the "Gypsum Prince" rounded Buoy A the "Yankee Sword" was a considerable distance to the north of Buoy A. The "Gypsum Prince" had sufficient room to proceed up the easterly side of the channel between these two outbound vessels and the line of the two buoys. Instead of proceeding in that way, the "Gypsum Prince" swung over to her port across the course on which the outbound vessels were proceeding, and then set her course diagonally across the channel towards the Harbor of Refuge Lighthouse. Johnson testified that this course was with the Harbor of Refuge Lighthouse about a point on the port bow, but I think Callahan, the wheelsman, was more nearly correct when he said that he steered with the Harbor of Refuge light "maybe three or four degrees off" the port bow. The "Gypsum Prince" crossed ahead of the "Yankee Sword" and the "Craigsmere", and the "Yankee Sword" was forced to swing to her port to avoid collision. Johnson saw the "Voco" when she was heading towards the Harbor of Refuge light; a short time later he noticed that the vessel was swinging to come down the bay showing her red light. He thereupon blew a one whistle signal to the "Voco" and ordered the wheel of the "Gypsum Prince" "right easy, then midships and then steady". I accept the testimony of Callahan, the wheelsman, that this order brought about a change in the heading of the vessel of "another degree or two" to starboard. About four or five minutes later Johnson blew what he termed "a prolonged blast of the whistle" of from six to eight seconds duration. Black, the chief engineer, heard the whistle, and considered it so long that he thought "it might be stuck". Captain Blair, Chief Officer Billett and Patching of the "Voco" were clear that the signal was two blasts. That also was the testimony of First Officer Look and Third Officer Vining of the "Yankee Sword", and of Acting First Officer Nelson of the "Craigsmere". On this testimony, I find that the "Gypsum Prince's" signal was a two whistle signal. After the signal was blown, the "Voco"

was seen to be turning on a left helm and her green light appeared. The engines of the "Gypsum Prince" were thereupon stopped and the wheel put hard right, but almost immediately thereafter the engines were started again full speed ahead and the helm put hard right. The engines on the "Gypsum Prince" were at full speed ahead from 6:07 or 6:08 until the first stop signal at 6:36; about 15 seconds afterwards they were started again at full speed ahead, and 20 or 30 seconds later the collision occurred. The way the vessels came together and the angle of collision was as already stated in connection with the navigation of the "Voco".

The "Gypsum Prince" was at fault (1) for not having a proper lookout on the forward part of the vessel, (2) for not keeping out of the way of the "Voco", (3) for sounding a cross signal, and (4) for not stopping and reversing.

It is undisputed that there was no lookout on the bow of the "Gypsum Prince" at any time after the pilot came on board. This was a serious fault which undoubtedly contributed to the collision. Chamberlain v. Ward, 21 How. 548, 62 U.S. 548, 16 L.Ed. 211; The Ottawa, 3 Wall. 268, 70 U.S. 268, 269, 18 L.Ed. 165; The Ariadne, 13 Wall. 475, 80 U.S. 475, 20 L.Ed. 542. See also The Paris, D.C., 37 F.2d 734, affirmed, 2 Cir., 44 F.2d 1018. It is no answer that those on the bridge were in as good a position to see and hear as a man stationed forward. The Cyrene, 4 Cir., 85 F.2d 935.

The vessels were proceeding so that the red light of the "Voco" was visible to the "Gypsum Prince", and the green light of the "Gypsum Prince" to the "Voco". The courses were well defined after the vessels started navigating with respect to each other, and they continued that way without substantial change until just before the collision. The case is, therefore, one of crossing courses, and governed by Articles 19 and 22 of the Inland Rules, 33 U.S.C.A. §§ 204, 207. The "Gypsum Prince" as the burdened vessel was accordingly required to keep out of the way. This she did not do, but she attempted to cross the "Voco's" bow, and then tried to extricate herself by turning sharply to starboard in a belated effort to make a port to port passing. The "Gypsum Prince" should never have attempted to cross ahead of the "Voco", for there was ample room to proceed up the easterly side

538

of the channel. She is condemned for not keeping out of the way of the "Voco".

■ The "Gypsum Prince" crossed the second one whistle signal of the "Voco" with two blasts. It has already been found that the "Gypsum Prince's" so-called "prolonged blast" was in fact a two whistle signal, and the evidence supports a further finding that the "Voco's" preceding second one whistle signal was actually heard by the "Gypsum Prince" despite Johnson's testimony that he did not hear the signal. When this second one whistle was blown by the "Voco", the vessels were only about a quarter of a mile apart, the wind at the time was strongly towards the "Gypsum Prince", and three disinterested witnesses from vessels farther away than the "Gypsum Prince" have testified that they heard the signal. I cannot believe, therefore, that the whistle was not heard by the "Gypsum Prince", and I find that it was so heard. The two whistle signal of the "Gypsum Prince" is thus established as a cross signal in violation of Rule II of the Pilot Rules. This was a clear fault of the "Gypsum Prince". Postal S. S. Corp. v. El Isleo, 308 U.S. 378, 60 S.Ct. 332, 84 L.Ed. 335; Olsen v. New York Central No. 18, 2 Cir., 120 F.2d 287; The Fulton, 2 Cir., 54 F.2d 467.

■ The "Gypsum Prince" was also at fault for not stopping and reversing when the danger of collision became apparent. After the two whistle signal was blown, the engines of the "Gypsum Prince" were momentarily stopped and the wheel put hard right; they were almost immediately thereafter started again full speed ahead and the helm put hard right. It will thus be seen that the "Gypsum Prince" never reversed, never sounded a danger signal, and kept on at full speed right up to the time of the collision. This was inexcusable conduct at a time when prompt action in reversing might well have averted, or at least minimized the effect of, the collision. The New York, 175 U.S. 187, 207, 20 S.Ct. 67, 44 L.Ed. 126.

The question remains whether the "Voco" was also at fault. On this branch of the case the "Gypsum Prince" makes two main contentions, namely, (1) that the "Voco" as the privileged vessel did not keep her course and speed as required by Article 21 of the Inland Rules, 33 U.S.C.A. § 206, and (2) that the vessel should have blown the danger signal and backed after the two whistle signal was blown in accordance with the provisions of Rule VII of the Pilot Rules.

■ With respect to the first contention, it is clear that the "Voco" kept her speed until after the two whistle signal was blown by the "Gypsum Prince". The finding regarding the course is that the "Voco" made a slight change in the heading to starboard at the time of the first one whistle, and that this ultimately resulted in a change of 8 degrees to a heading of 165 degrees true when the rudder was placed hard left after the "Gypsum Prince's" two whistles. This change in heading was made four minutes before the collision, and at a time when the vessels were three quarters of a mile apart. Both vessels then expected to pass port to port. Moreover, the change was so gradual during the succeeding two minutes that it could hardly have been perceptible to the "Gypsum Prince". Under these circumstances, it is clear that the change in heading was not a change of course at all, for the "Voco's" course could still "with accuracy be foretold." Commonwealth & Dominion Line v. United States, 2 Cir., 20 F.2d 729, 731; Clyde-Mallory Lines v. New York Cent. R. Co., 2 Cir., 83 F.2d 158, 160. But even if it be assumed that the change in heading was a change of course, the case for the "Gypsum Prince" would not be helped. The change in heading occurred two minutes before the two whistle signal of the "Gypsum Prince", and was so remote that it could not have contributed to the collision. The Steel Inventor, 2 Cir., 43 F.2d 958; The Energia, 2 Cir., 66 F. 604; cf. The Aakre, 2 Cir., 122 F.2d 469, 474. In any event, the faults of the "Gypsum Prince" are so glaring that it is unnecessary to be overzealous in scrutinizing the conduct of the "Voco". The Victory, 168 U.S. 410, 423, 18 S.Ct. 149, 42 L.Ed. 519; Globe Oil Delivery Corporation v. City of New York, 2 Cir., 129 F.2d 636, 638.

■ With respect to the second contention, the evidence is clear and uncontradicted that to have stopped and reversed after the two whistle signal from the "Gypsum Prince" would have swung the bow of the "Voco" to starboard and right in the way of the "Gypsum Prince". Pilot Rule VII has reference to a "misunderstanding or objection" to a cross signal; it has no application to the facts of the present case, where the "Voco" relied on the "Gypsum Prince's" two whistle signal

and turned to port to allow the "Gypsum Prince" to cross the "Voco's" bow. The maneuver might well have succeeded if the "Gypsum Prince" had followed out her expressed intention, but instead she swung sharply to her own starboard and into collision with the "Voco". I, therefore, hold that the "Voco" was free from fault.

There may be decrees exonerating the "Voco", and holding the "Gypsum Prince" solely at fault, with costs to the "Voco".