UNITED STATES of America, as owner
of THE Barge BC–634, Libelant,

v.

THE Motor Tanker J. A. COBB, Diesel
Tanker J. A. Cobb, Inc., Claimant,
and
The Central Railroad Company of New
Jersey, Respondent-Impleaded.

United States District Court
S. D. New York.
July 17, 1959.

Arthur H. Christy, U. S. Atty., New York City, for libelant, Benjamin H. Berman, Atty. in Charge, Louis E. Greco, Atty., Admiralty and Shipping Section, Dept. of Justice, Washington, D. C., of counsel.

Foley & Martin, New York City, for claimant, John H. Hanrahan, Jr., New York City, of counsel.

Vincent E. McGowan, New York City, for respondent-impleaded, T. A. Kelly, New York City, of counsel.

WEINFELD, District Judge.

The libelant seeks to recover damages for the loss of its Barge BC–634 which was in collision with Tanker J. A. Cobb, owned by the claimant. The collision occurred while the vessels were proceeding in opposite directions in Newark Bay underneath the Newark Bay Drawbridge, owned and operated by the Central Railroad Company of New Jersey. The railroad was impleaded by the claimant pursuant to Admiralty Rule 56, 28 U.S.C.A.

The bridge is of a vertical lift type with an east and west draw separated by a center abutment 200 feet in length. The west draw has a horizontal clearance of 216 feet, the east draw a clearance of 134 feet. The spans are opened by a bridge tender upon signal.

On the evening of July 28, 1954 at about 8:15 p. m., the Rogers, towing the BC–634 on her port side and two scows in tandem on her starboard side, left Staten Island bound for Newark Terminal, New Jersey.

During the course of the voyage, while northbound in Newark Bay, the Rogers signalled the bridge tender to raise the drawbridge to permit her passage. After some delay occasioned by a train passing over the bridge, the bridge tender, following an exchange of whistles, raised the west span for the Rogers to proceed. She was then about 100 yards south of the bridge. The Rogers then headed straight through the west draw at $2\frac{1}{2}$ knots against an ebb tide. The Cobb, then southbound, when north of the bridge, sounded a one-whistle signal for port-to-port passage to which the Rogers assented. The Cobb had just reduced her engines to half speed. With the tide underfoot she was proceeding at approximately $8\frac{1}{2}$ knots.[1] When the Cobb reached a point about 300 feet from the Rogers, she suddenly veered to port and headed straight for the Rogers. The Rogers sounded a danger signal, her engines were stopped, and she was put full speed astern. The Cobb continued on without reducing speed and struck the Barge BC–634, on the Rogers' port side, a powerful blow head on. The lines of the barge to the Rogers snapped and parted; the Cobb pushed the barge back through the draw, that is, southerly, and to the westerly abutment. Despite efforts to keep the BC–634 afloat, she sank.

The usual conflicting and irreconcilable versions given by members of the respective crews as to speed, distances, signals and point of collision, as well as other significant factors relating to the occurrence, are present in the instant case. All witnesses, with the exception of the bridge tender and two deck hands, testified in open Court.[2] After a study of the trial minutes, my own summary notes of witnesses' testimony, and an evaluation of their demeanor. I am persuaded that the version of the libelant's witnesses as to how the accident occurred is substantially correct; that as set forth

---

1. Including a carry-over from full speed ahead.

2. The bridge tender died before the trial.

His testimony, given at the Coast Guard hearing, was read into evidence, as were the depositions of the deck hands.

in the subjoined enumerated findings of fact, the collision was due to the negligent conduct of the Cobb in proceeding and continuing, under the existing circumstances, at an excessive rate of speed as it approached the bridge and to its failure to have a proper lookout stationed sufficiently forward at its bow. The credibility of witnesses called by the Cobb was cast in doubt by certain contradictory and irreconcilable aspects of their testimony with respect to substantial matters. The finding of fault of the Cobb rests not alone upon the testimony of libelant's witnesses but it is strengthened and pointed up by the version of the Master of the Cobb with respect to the passing signal.

The Master of the Cobb testified that when he sounded the one-blast signal to the Rogers, the vessels were not in shape to pass port-to-port but that an alteration was required by one or the other. According to his testimony given at the Coast Guard hearing shortly after the collision, the Master of the Cobb saw a white light and a green light on a vessel, which turned out to be the Rogers, when 180 feet away and while proceeding at half speed (6½ knots) with the tide underfoot. Upon the trial his testimony differed. He then testified that the white light and the green light were first observed when 400 feet away and at another point, when 300 feet away. In any event, whatever the distance, the Master acknowledged that it was indicated the vessels were on a collision course. Instead of giving a danger signal, he signalled for a port-to-port passage. He concedes that the situation did not call for a port-to-port passage and explains

that he "had in mind that that boat would—could be straightened up and pass safely on the port-to-port."

Here we have one of the conflicts in the testimony—the distance which separated the two vessels when each sighted the other and also when the passing signal was given. According to those on the Rogers, the Cobb was first observed when she was about 500 yards north of the bridge; she was showing a red light and a white bow light which, from the Rogers' point of view indicated a port-to-port passage. Accordingly, when the Cobb sounded a one-whistle signal inviting a port-to-port passage, the Rogers assented. The Rogers continued straight ahead until she observed the Cobb, then about 300 feet away, suddenly heading straight for her. The Rogers then sounded the danger signal, stopped her engines and put her engines full speed astern. The crash soon followed.

Upon the Captain's own version, his hazarding the port-to-port passage, when from his situation the vessels were on a collision course, his proceeding without reducing speed, veering suddenly and without warning or signal to the left into the BC–634, constituted negligence; particularly since he knew, when he sounded the one-blast signal, that the vessels were not then in shape to effect a port-to-port passage and that an alteration was required.[3]

Indeed, the Second Mate of the Cobb underscores the lack of prudent seamanship. He testified that at the time of the exchange of the one-whistle signals the Cobb was 700 feet from the Rogers. At other points in his testimony he fixed

---

3. The Cobb's counsel, in seeking to justify the Cobb's signal for a port-to-port passage, urges: "It is true that the proposal by the Cobb would require the Rogers to swing rapidly to her right in order for the passing to be completed safely but that proposal appears to have been the only one available."

In the face of overwhelming evidence that the Cobb veered suddenly to the port side and into the Rogers, counsel urges: "[T]he *probabilities* in this case certainly would warrant only the conclusion that

the Cobb did not turn left. Rather, it is *probable* that the Rogers' Master realized that his tow was not swinging to the right sufficiently fast, *possibly* as the result of the force of the current against the starboard side of his tow * * * and that the proposed port-to-port passing would not succeed." (Emphasis supplied). Claimant's brief, p. 7. Nothing in the record warrants indulgence either in the *probability* or the *possibility* suggested in explanation of the collision.

the distance variously at 300, 400 or 500 feet. He testified that when first observed, the Rogers was on the port side diagonally across the draw. The Mate continued:

"Q. When you saw the green light she was going in a westerly direction then, wasn't she? A. She was going in a westerly direction.

"Q. According to your testimony? A. That is right, she was going in a westerly direction.

\* \* \* \* \* \*

"Q. In order to effect a port-to-port passage she would have had to make a rather radical change in her course, would she not? A. She would have to make a change in her course, yes. She would have to straighten out. I *assume* she would have to straighten out before she could proceed up here north in that channel." (Emphasis supplied).

Thus, the testimony of the Cobb's Master and Second Mate demonstrates that the Master indulged in assumption as to the Rogers' course. To have indulged in such assumptions and to have continued at the same rate of speed was, under the prevailing circumstances, lack of prudent seamanship. Whatever doubt existed as to the Rogers' course should have been resolved in favor of safety and not left to chance.

The testimony of those aboard the Rogers' tow even more strongly indicates the Cobb's fault, as specified in the detailed Findings. When the bridge tender signalled for the Rogers to enter the west draw, she was approximately 100 yards south of the bridge. The Rogers proceeded into the draw on a course parallel to the center abutment, with the starboard tow of the flotilla within 5 to 10 feet of the abutment. The tow was 93 feet in width. The believable evidence

establishes that there was not less than 75 feet clearance between the port side of the tow and the west abutment; that there was more than ample room for the Cobb, which was 30 feet in width, to have proceeded and effected a port-to-port passage—in the words of Captain De-More of the Rogers, enough room so that one "could put two more of the Cobb through there".

Other evidence, likewise acceptable, was of a similar purport. The testimony on this issue was strongly corroborated by the bridge tender who appears to have been the sole witness without allegiance to any of the vessels involved.

■ The Cobb was also negligent for failure to station a lookout up forward. The pilothouse of the Cobb was located 150 feet aft of the bow and the only lookout was stationed there. Considering that the Cobb was approaching a bridge, and further that other vessels might be coming around the center abutment of the bridge, a lookout might well have given earlier warning of the Rogers' presence and thus averted the collision. The Cobb's Master testified that he never stationed a lookout forward on the bow except in thick fog; this, even though, according to his testimony, the abutment obstructed his view to the south and so might conceal northbound vessels. However, it is contended that weather conditions were such that the lookout in the pilothouse could function as effectively as one forward. Repeatedly the Courts have held that it is no answer that others located elsewhere were in as good a position as a lookout stationed forward to hear and see.[4] Failure to keep a proper lookout is deemed a statutory fault.[5] And the Cobb has failed, under the Pennsylvania Rule,[6] to prove that such failure did not or could not have contributed to the collision.

4. Wood v. United States, D.C.S.D.N.Y., 125 F.Supp. 42, 51; The Voco, D.C.S.D.N.Y., 57 F.Supp. 531, 537, affirmed sub nom. Socony Vacuum Transp. Co. v. Gypsum Packet Co., 2 Cir., 153 F.2d 773.

5. Ulster Oil Transp. Corp. v. The Matton No. 20, 2 Cir., 210 F.2d 106; Gulf Oil Corp. v. The Socony No. 16, 2 Cir., 162 F.2d 869.

6. The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148.

The question remains whether the fact that the Rogers used the west draw, the only one which the bridge tender opened, instead of the east draw, also casts her in liability requiring a division of damages.

The claimant urges that the Rogers must be held at fault for violation of the Narrow Channel Rule, which provides:

"In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel." [7]

■ ■ The Rule is not absolute. It is not required that it be rigidly and blindly followed in all cases.[8] By its very terms it applies only "when it is safe and practicable". Special circumstances may warrant, indeed compel, departure from its mandate in the interests of safe navigation.[9] The force of the statute may yield in face of peculiar local conditions which make adherence to the Rule unsafe. Demonstrated experience of those who navigate in the particular locality is a measure of whether or not departure is justified.[10]

■ The evidence abundantly establishes that for a quarter of a century, large vessels and vessels with tows, proceeding northerly under the bridge, have used the west draw because of its greater width. Obviously, because of the turn of the channel, passage through the west draw presents less hazard than passage through the narrower east draw. As one witness put it, the east draw "is really too small to go through with tows". It is not without significance that all the tow companies requested of the respondent-impleaded, the bridge operator, that the west draw be used. The custom and practice in effect for twenty-five years reflects universal recognition that it is not "safe and practicable" for northbound large vessels and tugs with tows to use the east draw or starboard side of the channel in passing under the Newark Bay Bridge.[11] No evidence has been offered nor has it been suggested that the common practice is unreasonable or is not based on considerations of safety.

Since the evidence establishes that the commonly accepted custom rests upon factors of mutual safety arising by reason of local conditions, the Rule is in abeyance.[12] Under the circumstances, fault cannot be charged either to libelant for entering the west draw or to respondent-impleaded for opening it.

■ The Court has considered claimant's contention that Pfeifer Oil Transp. Co. v. The Ira S. Bushey,[13] requires a contrary conclusion. However, as correctly pointed out by libelant's counsel, that case has no application to the instant matter. It is true that the Court of Appeals there held that Newark Bay was a narrow channel subject to the Inland Rules. However, the use of either the west draw or the east draw of the bridge was not at issue. In the instant case, the Rogers, under the long standing custom, used the west draw, treating it as a narrow channel, as did all other large vessels and tugs with tows. Its duty under this circumstance was to keep to the starboard of the west draw which, as already found, it did.

Accordingly, the Court makes the following

Findings of Fact.

1. On July 28, 1954 the libelant, United States of America, was the owner and operator of the Barge BC–634, and also the bailee of the cargo laden thereon.

7. 33 U.S.C.A. § 210.

8. The Three Brothers, 2 Cir., 170 F. 48, 50.

9. Martin Marine Transp. Co. v. Jakobson & Peterson, Inc., 2 Cir., 135 F.2d 325, 328.

10. The Transfer No. 21, 2 Cir., 248 F. 459, 462.

11. Cf. The Three Brothers, 2 Cir., 170 F. 48, 50.

12. Martin Marine Transp. Co. v. Jakobson & Peterson, Inc., 2 Cir., 135 F.2d 325, 328.

13. 2 Cir., 129 F.2d 606.

2. Diesel Tanker J. A. Cobb, Inc. was the owner and operator of Tanker J. A. Cobb.

3. The respondent-impleaded, the Central Railroad Company of New Jersey, was the owner and operator of a railroad drawbridge across Newark Bay.

4. There is an east and a west draw under the bridge, separated by an abutment approximately 200 feet in length. The horizontal clearance of the west draw is 216 feet. The horizontal clearance of the east draw is 134 feet.

5. The custom and practice for large vessels and vessels with tows proceeding north and south under the bridge is to use the wider draw, i. e., the west draw. The custom has existed for twenty-five years.

6. Vessels intending to pass under the bridge blow a three-whistle signal to the bridge tender who answers with three whistles if circumstances permit the opening of the bridge.

7. (a) On July 28th the Rogers, with three loaded barges in tow, left Staten Island at about 8:15 p. m. bound for Port Newark Terminal, New Jersey. The voyage would require the Rogers to pass under the railroad bridge across Newark Bay. When the Rogers left Staten Island, and at all times thereafter, she was towing Barge BC–634 on her port side and two open scows in tandem on her starboard side.

(b) The length of the Rogers was 125 feet, and the total length of the two barges on her starboard side was 220 feet. The bow of the starboard barge extended approximately 15 feet beyond the bow of the Rogers.

(c) The width of the BC–634 was 31 feet, that of the scows on the starboard side 30 feet, and the width of the Rogers 32 feet. Thus, the total width of the Rogers and her tow was 93 feet.

8. The Captain and the Mate of the Rogers were in the pilothouse of the Rogers and had a clear unobstructed view to port, ahead and to starboard.

9. After leaving Pier 11, Staten Island, the Rogers and tow proceeded through the Kills and then north up Newark Bay toward the Newark Bay Drawbridge owned by the Central Railroad Company of New Jersey.

10. Two deck hands were stationed at the bow of the Rogers to act as lookouts.

11. (a) On the same evening, Tanker J. A. Cobb, after loading a cargo on the Passaic River in Newark, left there bound for Island Park, Long Island. The voyage would require the Cobb to pass under the Newark Bay Drawbridge across Newark Bay.

(b) The Cobb is 180 feet in length, 30 feet in width, and her pilothouse is located 150 feet from her bow.

12. All the vessels involved in this matter were properly lighted.

13. At approximately 8:35 p. m. the bridge tender, in answer to a three-whistle signal, opened the west draw for a Sunoco tanker proceeding south in Newark Bay. The three whistles of the Sunoco tanker and the answering whistles of the bridge tender were heard by the Master of the Rogers, as the Rogers was rounding Bergen Point, a distance of approximately 450 yards south of the bridge.

14. The Master of the Rogers could distinguish the whistle signal of the bridge from the whistle of vessels operating in the vicinity. The Rogers proceeded about 200 yards, then stopped her engines and the Sunoco vessel passed the Rogers. Before stopping, the Rogers was making about 2½ knots over the ground, bucking a 2 to 2½ knot ebb tide.

15. The Rogers at this point blew three whistles for the bridge to open. The bridge answered with two whistles, indicating the approach of a train. The bridge remained closed for approximately 7 to 10 minutes while the train passed over it. After the train passed, the Rogers again blew three whistles. The bridge tender lifted the west span but not to its full height. The Rogers then blew a few rapid whistles and three additional whistle signals requesting the span be lifted to its full height. Then the bridge went up to its full height, and the bridge tender blew another three

240

whistles to the Rogers to go through the draw. At the time the bridge opened for the passage of the Rogers, the Rogers was 50 to 100 yards south of the bridge.

16. At no time did the Master or Mate of the Rogers hear any other vessels' signal.

17. Prior to the collision, referred to hereafter, Parcell, the bridge tender, heard no signal sounded by the Cobb, nor did he observe the Cobb or any other vessel, other than the Rogers tow, although he was observing traffic in both directions.

18. As the Rogers entered the west draw, it was not proceeding at an angle but was heading straight through the draw with its starboard close to the east abutment.

19. When about right in the draw, the Captain and the Second Mate of the Rogers observed the lights of the Cobb approaching from the opposite direction. The Cobb was then off Can Buoy No. 5 and about 500 yards north of the bridge and proceeding at full speed with an ebb tide underfoot.

20. The Cobb was showing a red light and a white bow light which indicated that she was heading to starboard. The Cobb was in the middle of the channel. Up to that time, no whistle signals were heard from the Cobb. When the Cobb was approximately 400 yards north of the Rogers, the Cobb sounded a one-whistle signal, inviting a port-to-port passage and reduced her engines to half speed. The Rogers answered with one whistle.

21. The Rogers was still proceeding straight ahead and parallel with the bridge center abutment with its starboard side close to, almost touching, the east abutment. The Cobb continued on without reducing speed and when about 300 feet from the Rogers, suddenly shifted her course and headed directly toward the Rogers tow. The Rogers sounded a danger signal, her engines were stopped and she was put full speed astern.

22. The Cobb was out of control and going at an excessive rate of speed as it approached the bridge.

23. The Cobb still continued on without reducing speed with the tide underfoot and struck the Barge BC–634, which was on the Rogers' port side, a powerful blow head on. The collision occurred when the stern of the barge had passed under and was beyond the north side of the bridge. The impact was so powerful that it snapped all lines between the barge and the tug.

24. No one was observed at the bow or on the deck of the Cobb prior to the collision.

25. There was sufficient clearance for the Cobb to pass through the draw without striking the barge. There was a minimum of 75 feet clearance between the port side of the BC–634 and the westerly abutment immediately prior to and at the time of the collision. Following the collision, the BC–634 struck the fender rack at the westerly side of the bridge. The Cobb backed out of the draw to the northward. The BC–634 kept going in a southerly direction and then in a westerly direction with the tide.

26. When the barge was between the bridge and Can Buoy No. 3, about 250 yards south of the bridge, the Tug Thomas Tracy, light, coming through the east draw, proceeded to the assistance of the barge. The Cobb proceeded beyond the bridge, turned around and returned to the BC–634.

27. The Barge BC–634 sank, decks to, and was beached by the Rogers in a 6-foot shoal between Can Buoys 5 and 11, about 1,000 yards north of the bridge.

28. When the Newark Bay Drawbridge was observed by the Cobb about 2 miles distant, it was closed. There was no lookout stationed at the bow of the Cobb prior to the collision or at the time of the collision. The Master of the Cobb did not take into consideration the fact that other vessels might be coming around the center abutment of the bridge.

29. At full speed with the ebb tide underfoot, the Cobb would make a minimum of 9½ knots to a maximum of 10½ to 11 knots. At half speed, the Cobb would make a minimum of 6½

knots. At the time of the collision the speed of the Cobb was about 8½ knots.

30. The Cobb's failure to have a proper lookout stationed at the bow of the vessel, 150 feet forward of the pilothouse, was, under the existing circumstances, lack of prudent seamanship.

Conclusions of Law.

1. The Court has jurisdiction over the parties and the subject matter.

2. The Motor Tanker J. A. Cobb was negligent and solely responsible for the collision. .

3. Neither the Rogers, nor the respondent-impleaded, is chargeable with any negligence with respect to the collision.

4. The libelant, the United States of America, is entitled to an interlocutory decree against the J. A. Cobb for the amount of its damages, together with interest and costs, and the petition impleading the Central Railroad Company of New Jersey, should be dismissed, with costs.