**PLACID OIL COMPANY and Hassie Hunt Trust, W. H. Hunt, Trustee, Libellants and Cross-Respondents,**

v.

**S.S. WILLOWPOOL, Her Engines, Tackle, Apparel, etc., Pool Shipping Co., Ltd., and Sir R. Ropner and Co., (Management) Ltd., Respondents and Cross-Libellants.**

No. 704.

United States District Court
E. D. Texas,
Beaumont Division.
Feb. 20, 1963.

C. A. Brown, Royston, Rayzor & Cook, Galveston, Tex., George W. Brown, Jr., Brown & Fulbright, Beaumont, Tex., Lemle & Kelleher, New Orleans, La., for libellants and cross-respondents.

Edward W. Watson, Eastham, Watson, Dale & Forney, Galveston, Tex., for respondents and cross-libellants.

FISHER, District Judge.

This case concerns a collision between a moving vessel and a stationary unmanned gas well platform situated in navigable waters of the Gulf of Mexico on the Outer Continental Shelf, July 13, 1960.

Libellants were the owners of the fixed, off-shore, unmanned platform or structure made of steel and set into the bed of the Gulf of Mexico in approximately 100 feet of water, with its upper structure extending 50 feet above the surface of the Gulf waters. It was physically located on Outer Continental Shelf Oil and Gas Lease No. 0437, Eugene Island Area, Gulf of Mexico, at Latitude 28° 42′ 24.695″ North and Longitude 91° 46′ 11.734″ West, more than fifty miles off the Louisiana Coast.

This unmanned platform had been designated by the U. S. Coast Guard at New Orleans, Louisiana, as Placid 104–2, and was known additionally as Well No. 2, Block 199 and OCS 0347–2, Eugene Island Area, and for simplification, will be referred to hereinafter as Platform 199–2.

An Oil and Gas Lease for Block 199, Eugene Island Area, was granted to Libellants by the United States of America, and said Platform 199–2 was erected in Block 199 in accordance with and pursuant to authorizations from the United

States Corps of Engineers. Said Platform 199–2 was around a completed but shut-in gas well owned by the Libellants.

The private aids to navigation on Platform 199–2 were placed thereon after an application to, and approval of that application, by the District Commander, U. S. Coast Guard, New Orleans, Louisiana, and Headquarters, U. S. Coast Guard, Washington, D. C., and consisted of two light fixture apparatuses, one on each of diagonal corners, and a fog signal apparatus, all located on the top of Platform 199–2.

In the immediate area of Platform 199–2 were three other similar type, unmanned, fixed platforms protecting completed but shut-in wells, with two light apparatuses and a fog signal on each, known as 199–1, 202–2, and 198–2, all owned by the Libellants. There was also an offshore drilling rig known as "Penrod 52", not owned by Libellants, which was actively engaged in drilling operations in Block 202–3 at the time in question.

The S.S. WILLOWPOOL was and is a large ocean-going, British flag steamship, 486 feet in length, 61 feet 8 inches in breadth, of 8,971.99 gross tons and 5,731.62 net tons, owned and operated by the Respondent and Cross-Libellant herein, Pool Shipping Company, Ltd. of Darlington, England.

On July 13, 1960, the S.S. WILLOWPOOL was proceeding in a generally westerly direction from Dry Tortugas to Sabine Pass, in ballast, and without cargo, with its destination being the port of Port Arthur, Texas. At approximately 10:30 P.M. on the night of July 13, 1960, the S.S. WILLOPOOL collided with Platform 199–2, demolishing said Platform and causing substantial damages to the completed but shut-in gas well, and further, sustaining damages herself.

The Libellants assert many allegations of fault and neglect on the part of the S.S. WILLOWPOOL and those in charge of her, the principal ones of which are, (1) that she was not maintaining a proper lookout; (2) that she failed to make proper and effective use of her radar, and (3) that she failed to obtain and/or make proper and effective use of and to observe the Notices to Mariners and Charts informing navigators of the presence and location of such unmanned platforms.

The Respondents answer, contending that the S.S. WILLOWPOOL and those in charge of her were not in any manner at fault, and further, alleging by cross-action, that the Libellants were at fault in failing to comply with the statutory requirements for the maintenance of aids to navigation on Platform 199–2, more specifically, the lights and the fog horn.

The issue of damages has been severed from this cause; therefore, only the question of liability will be determined at this time.

Factually, this case is very similar to the recent case of Continental Oil Company v. M. S. Glenville, D.C., 210 F.Supp. 865 (1962), and many of the authorities cited therein are equally applicable to this case.

■ In determining the issues and ruling on the liability in this case, we must begin with a presumption that when a moving ship collides with either a vessel at anchor or with a stationary or fixed object, there is not only a presumption in favor of the anchored vessel or stationary object, but a presumption of fault on the part of the moving vessel which shifts the burden of proof.[1]

■ Therefore, for the S.S. WILLOWPOOL to absolve herself from any liability, she must show that she was without fault or that the collision was occasioned by fault on the part of the stationary Platform 199–2, or was the result of an inevitable accident.

Considering first the alleged faults of the S.S. WILLOWPOOL, let us reconstruct the setting prior to and at the time

---

1. The Oregon, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943 (1895); The Louisiana, 3 Wall. 164, 70 U.S. 164, 18 L.Ed. 85; The Victor, 153 F.2d 200 (1946); Continental Oil Company v. M. S. Glenville, supra, and cases therein cited.

of the collision. The S.S. WILLOW-POOL, an elegant and new vessel, on her third voyage since launching, and her first venture into the Gulf of Mexico, was proceeding, with cargo gear raised, from her last port to Port Arthur, Texas. She was equipped with a modern radar set, which was actually on and being used by the officer on watch. She was using a relatively small scale chart, without any definite knowledge as to specific location of offshore structures and drilling rigs lying in her course, except for a general caution appearing on Admiralty Chart 3981 (Resp. Ex. 37), "Cape San Blas to Ship Shoal", which stated, "numerous oil derricks carrying lights and fog signals exist within, and in the vicinity of, the 20 fathom line and are subject to frequent change."

She was proceeding at her maximum speed, in excess of 14 knots, on automatic pilot, under weather conditions described by the officer on watch, Third Mate Jones, as "a very dark night, very clear atmosphere, visibility very good, wind approximately force 2, light force 2, slight ripple in the sea", and which the Master described as "a beautiful night for sailing with practically unlimited visibility."

To complete the setting, there was an officer on the bridge in charge of navigation, Third Mate Jones, and lookout, Wescott, who was stationed on the starboard wing of the bridge by Third Mate Jones.

The drilling rig "Penrod 52" was first observed approximately 17 miles away and was almost directly ahead of the course and path of the S.S. WILLOW-POOL. The course of the WILLOW-POOL was changed when approximately 6 miles from "Penrod 52", and was again changed back when the drilling rig was estimated to be off her port beam, then proceeded at full speed ahead some 2.1 nautical miles prior to the collision with Platform 199–2. (At 14 knots, the distance of 2.1 nautical miles could be traversed in less than ten minutes).

It is clear from the facts and authorities, hereinafter cited, that ordinary common sense, ordinary prudence and ordinary good seamanship would require a qualified, efficient and vigilant lookout. Did the S.S. WILLOPOOL, and those in charge of her, fail to keep a proper lookout?

It is undisputed that the lookout, Wescott, at the time of the collision was stationed on the starboard wing of the bridge, some 233 feet from the bow. There is credible testimony from the Chief Mate Robinson, Second Mate Hayward and Third Mate Jones that from experience, the best location to station a lookout, in order to best serve his purpose as lookout in good visibility, would be on "monkey island", an open area on top of the wheelhouse portion of the bridge. In fact, it was the usual and customary practice for the watch officer to place a lookout on top of "monkey island", only the testimony of Captain Churchill being to the contrary. Neither the officer in charge of navigation, Third Mate Jones, nor the assigned lookout, Wescott, could adequately explain why Wescott had been stationed on the starboard wing of the bridge, rather than on "monkey island." It is interesting to observe that a lookout was assigned and stationed on "monkey island" after the collision and until daylight. There is also credible testimony in the record that the lookout was changed "out at sea in the ocean every hour." However, lookout Wescott had been on duty for approximately two and one-half hours at the time of the collision.

The lookout, Wescott, did not maintain his assigned lookout at all times. Neither did he use binoculars while performing lookout duties. The lookout went from the starboard side to port side to look at and observe the drilling rig, "Penrod 52." As will be recalled, the S.S. WILLOWPOOL passed one-half to three-quarters of a mile from "Penrod 52" when directly off the port beam. The lookout testified that he "may have and I may not" have used binoculars to look at "Penrod 52", but that the officer on watch was also on the port side, watching "Penrod 52", and that he was using

binoculars to observe "Penrod 52." Both the lookout and the watch officer admitted that they had never seen a drilling rig as spectacular as "Penrod 52." It is obvious that these two men, in whose hands the fate of the S.S. WILLOWPOOL was placed, were impressed by the magnificence of the drilling rig and were not as attentive and alert, under the circumstances, as they should have been to their respective duties.[2]

■ The Court is of the opinion and finds that the S.S. WILLOWPOOL, and those in charge of her, were not keeping and maintaining a proper lookout as required by the above cited authorities; this fault was a major fault and actively contributed to the collision.

Was the S.S. WILLOWPOOL at fault in not using her radar, under the circumstances? The undisputed testimony from the S.S. WILLOWPOOL shows that she was equipped with a British manufactured Marconi Marine Radar, in good operating condition, and it had been on since 7:00 P.M., the night of the collision. An oil drilling rig was observed on the radar screen some two hours prior to the collision and the ship's distance from the rig was calculated and plotted. Thereafter, the radar was on and in operation. There is credible testimony from the officer on watch, Jones, that he was using radar only for navigational purposes, and not collision purposes. Not knowing the location of the various platforms and drilling rigs in the Gulf, and

particularly the area she was approaching prior to her collision with Platform 199–2, the officer on watch, under careful and prudent navigation, should have made use of this valuable instrument to have avoided the collision. There can be little dispute that its use would have revealed the presence of Platform 199–2 ahead of the vessel at any time after she was within 14 to 17 miles of Platform 199–2.

The Court is of the opinion and finds that the failure of the S.S. WILLOWPOOL and those in charge of her to make proper use of the available radar, under the circumstances, resulted in a gross and glaring fault which proximately contributed to the collision.[3]

Did the S.S. WILLOWPOOL, and those in charge of her, fail to obtain and/or make proper and effective use of and to observe the Notices to Mariners and Charts?

There can be no real dispute that the exact and specific location of Platform 199–2 was available to the S.S. WILLOWPOOL, and those in charge of her. The Master of the vessel discussed going through areas of oil drilling rigs and platforms with his officers prior to leaving Miami, Florida. However, no affirmative acts were undertaken to secure this information, which was available through many sources, such as *Local Notice to Mariners and Weekly Notices to Mariners*.

2. In Anthony v. International Paper Co., 289 F.2d 574, at page 580, that court said:
   "It has been held in a number of decisions in the Second and Fifth Circuits that failure to have a proper lookout is a *statutory* fault or, in any event, is such a grave default in careful navigation as to impose upon the ship the same obligation as rests upon one which has been guilty of a statutory fault." See Rule 29, International Rules, 33 U.S. C.A. § 147a; The Ottawa, 3 Wall. 268, 269, 272–273, 18 L.Ed. 165 (1866); St. John v. Paine, 10 How. 557, 585, 13 L.Ed. 537, 4 Cir. (1850); The Genesee Chief, 12 How. 443, 463, 13 L.Ed. 1058 (1851); Coyle Lines v. United States, 5 Cir., 195

F.2d 737; United States v. The J. A. Cobb, et al., D.C., 182 F.Supp. 234, aff'd., 2 Cir., 283 F.2d 754; Continental Oil Company et al. v. M. S. Glenville, 210 F. Supp. 865, and authorities therein cited.

3. National Marine Service, Incorporated v. Barrios Bros., Inc., 5 Cir., 286 F.2d 573 (1961); Afran Transport Co. v. The Bergechief, 2 Cir., 274 F.2d 469 (1960); United States v. S. S. Washington, 4 Cir., 241 F.2d 819 (1957), cert. den., Texas Co. v. U. S., 355 U.S. 817, 78 S.Ct. 21, 2 L.Ed.2d 34; The Hindoo, D.C., 74 F. Supp. 145; White Stack Towing Corp. v. Bethlehem Steel Co., 4 Cir., 279 F.2d 419, 423 (1960); Continental Oil Company v. M. S. Glenville, supra.

This Court is of the opinion and finds that the S.S. WILLOWPOOL, and those in charge of her, did fail to obtain and/or make proper and effective use of available charts. Such failure was a gross and glaring fault and one that proximately contributed to the collision.[4]

Considering next the alleged faults against Platform 199–2, it appears to the Court that the Libellants complied with its duty in regard to the equipment designated as Aids to Navigation. The Court finds that several hours prior to the collision, the lights and the fog horn on Platform 199–2 were working properly. Because the platform was completely destroyed, this Court must decide from a preponderance of the credible evidence, based on probability rather than possibility, whether or not the Aids to Navigation were in proper working condition at the time of the collision.

It is admitted by the S.S. WILLOW-POOL, and those in charge of her, that a fog horn was heard which, by inference, would be the fog horn from Platform 198–2. Being in such close proximity, it would be difficult to determine whether the fog horn was from Platform 198–2 or Platform 199–2. Furthermore, we have the fact that the Libellants say that the fog horn was not working on Platform 198–2. This being true, then the fog horn would have to come from Platform 199–2, rather than Platform 198–2.

The weather being clear and visibility unlimited, it is doubtful as to whether or not there was a duty to have the fog horn sounding. Therefore, regardless of where the sound emanated, it should have been sufficient warning to cause the lookout to be more diligent and careful in the lookout that was being made, even to the point of determining the location by use of the radar.

As to the lights, on the basis of probability, rather than possibility, the Court finds the lights were burning at the time of the collision. This finding is supported by a preponderance of the credible evidence. The only evidence to the contrary is the testimony of the Third Mate Jones and the lookout Wescott, to the effect that they "never saw the lights." Even if the lights were not burning, this fault would be minor, under the circumstances.[5]

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and of this cause of action.

2. That the S.S. WILLOWPOOL, and those in charge of her, was at fault in failing to maintain a proper lookout, in failing to make proper and effective use of her radar, and in failing to obtain and/or make proper and effective use of and to observe the available charts and Notices to Mariners.

3. That each of the faults listed in No. 2 above was grave, gross and glaring, and each of said faults actively contributed to the collision and was the proximate cause, or causes, thereof.

4. Davidson Steamship Co. v. United States, 205 U.S. 187, 27 S.Ct. 480, 51 L.Ed. 764 (1907); Utility Service Corporation v. Hillman Transportation Co., 3 Cir., 244 F.2d 121 (1957); Baltimore & Boston Barge Co. v. Eastern Coal Co., 1 Cir., 195 F. 483 (1912); United States v. M/V Martin, and Barge MOS-101, D.C., 198 F.Supp. 171; Continental Oil Company et al. v. M. S. Glenville, supra.

5. "Where the gross negligence of one vessel is wholly sufficient in itself to account for the collision, but the other vessel has committed a technical fault not shown to have contributed to the collision, and where the error of the latter is minor, doubt as to the latter's conduct will be resolved in her favor. * * * Furthermore, where the active fault of one vessel so flagrantly and heavily outweighs the passive faults of omission of the other vessel, the interests of justice are best served by condemning the more culpable vessel completely. The Great Republic, 23 Wall. 20, 90 U.S. 20, 23 L.Ed. 55". Compania De Maderas, etc. v. The Queenston Heights, 5 Cir., 220 F.2d 120 (1955), cert. den., Esso Shipping Co., v. Compania De Maderas, etc., 350 U.S. 824, 76 S.Ct. 52, 100 L.Ed. 736; Continental Oil Company v. M. S. Glenville, supra.

4. That each of the faults described in No. 2 above was of a major nature.

5. That Libellants' (Platform 199-2) fault, if any, was passive, technical, not substantial and so slight as to be disregarded inasmuch as it did not contribute to the collision.

6. The Court therefore concludes that the collision was solely caused by the faults of the S.S. WILLOWPOOL, and those in charge of her, and the S.S. WILLOWPOOL should be compelled to bear all damages of Libellants, including costs of Court.