### SIMPSON & Co. *v.* DALL.

1. Where a bill of exceptions at all fairly discloses the fact that the exceptions were made in proper time, this court will not allow the right of review by it to be defeated because the bill uses words in the present tense, when the true expression of the court's meaning required the use of the past one; nor because the bill is unskilfully drawn, and justly open, philologically, to censure.

2. A party offering secondary evidence of the contents of papers must show that he has in good faith exhausted, in a reasonable degree, all the sources of information and means of discovery which the nature of the case would naturally suggest, and which were accessible to him: *Hence,* Where certain original letters had been passing between two attorneys

in a case, and one of the attorneys testified that he had looked over his papers for all such documents as related to the case, and that the needed letters were not among them; that he recollected thinking about the letters at the time he was looking over his papers, but (being under the impression that he had left them with his colleague) did not make "any special search for them."

And where the other attorney testified that he *had* had the letters, but was under the impression that he had returned them to the first attorney; that he had not examined his *files* of letters, and, not finding his letters among the other papers in his possession, supposed that the first attorney had them.

*Held*, that the secondary evidence of the contents of the letters was wrongly given: the court assuming of course that the search was insufficient.

8. Where a solvent firm owing *bonâ fide* a debt, learns—though by irregular and perhaps improper means on the part of one of their number—that the debt is about to be attached by a creditor of the person to whom they owe it, they may nevertheless pay the debt as soon as they please and in such securities, including their own negotiable note, as their creditor is willing to accept; and if the debt is actually paid, and so acknowledged by their creditor to be, the creditor of such creditor cannot make them pay it over again to *him;* though his attachment may thus have been provokingly defeated. Neither is there anything in the laws of Tennessee relating to the attachment of debts due by non-residents that militates with this doctrine that a solvent man may at any time pay his just debts not attached by lawful process.

DUNHAM & KEARFOOT, of Baltimore, were indebted on two notes, amounting to about $3000, to Dall, Gibbons & Co. of the same place, but were insolvent and did not pay. In this condition of things, Dall, Gibbons & Co. hearing that a house in Rogersville, Tennessee (Simpson, Duff & Co.), which was solvent, owed money to the insolvent debtors just named, at Baltimore, set themselves at work to get payment, by attachment, from *it.* Addressing his letter to Rogersville, Tennessee, Mr. Cocke, their attorney in Baltimore, accordingly wrote—first on the 16th of March, 1858, and then on the .7th—to a cousin of his, Mr. Jones, a professional gentleman, who *had* been residing at Rogersville, but who was now in Florence, Alabama, a place three or four hundred miles away; from which place, however, it seemed that he was ready to return when any business worthy of so long a journey made it worth his while to do so; Mr. Cocke, who wrote the letters, being a member of the law firm of G. W.

Howard & Co., at Baltimore, and the letters having been put under an envelope stamped externally with the business card of that partnership. Cocke was, moreover, a cousin of *Mr. Simpson's* wife. The letters were of such a character that Mr. Jones "might have felt authorized, if not directed, to consult Simpson & Co., whose debt he was requested to attach, in relation to the business."

On what exact day these letters reached the Rogersville post-office did not appear. The regular course of the mail would have brought them there about the 19th or 20th of March; but if they happened to drop into a distributing-office by the way—"a thing which very often happened"—they would have been delayed till the 21st or 22d. There was, of course, also, the ordinary chance of other accidents. When they did arrive, however, at Rogersville, they were put, as it turned out, into the post-office box of this very firm of Simpson, Duff & Co. From the post-office the letters went to the counting-house of this firm. Here Mr. Duff, a member of the firm, opened and read them; and perceiving their contents, *mentioned the fact of his having opened them and of what was in them to his partner Simpson*, the senior and active partner of his firm. He then *re*-sealed them, and in a letter post-marked the 29th March, though dated the 27th, transmitted them in a friendly letter to Mr. Jones, at Florence; *not telling him, however, that he had opened the letters or was possessed of their contents.*

On the receipt of the letters, which got to Florence on the 1st of April, Jones came hastening up to Rogersville, getting there, perhaps, on the 4th. In the meantime, however, the Baltimore creditors having heard that Mr. Jones no longer resided at Rogersville, wrote, on the 25th of March, to another lawyer there, Colonel McKinney, placing the matter in *his* charge, and directing him to get the letters from the Rogersville post-office. Going to the post-office, he learned that the letters had been put into Simpson, Duff & Co.'s box. Following the matter up to Duff, he was told on the 29th that the letters had been forwarded to Mr. Jones, at Florence, "several days before." He then in-

quired of Simpson as to the state of their account with Dunham & Kearfoot, the insolvent firm at Baltimore; a matter which Simpson "did not know about exactly,"—"would look at his books for,"—inviting Colonel McKinney "to call the next day." On the next day Colonel McKinney called, and learned that, on the 26th preceding, they had remitted $2000 of their debt to their creditor house at Baltimore. They still owed, apparently, about $3100. On the 7th of April an attachment was issued; but it was too late to profit the persons for whom it was issued; for, on the 1st April preceding, Simpson & Co. had remitted the whole balance to their creditors at Baltimore; sending various negotiable notes for $1600 of it, and their *own* negotiable note for the remaining $1500. A receipt was returned on the 5th; two days, of course, before the attachment issued.

In the meantime, and perhaps, as already said, about the 4th April, Mr. Jones presented himself at Rogersville. The first thing he did was to go to Simpson, Duff & Co., to consult with them about their debt, which he had been requested to attach. He showed to Mr. Simpson the two letters which he had received, and "asked Simpson's counsel in the premises." Simpson, without informing him that he was already apprised of what the letters contained, informed him that the claim had been "turned over" to another attorney, Colonel McKinney, who was now "trying to get an attachment on the amount his firm might owe Dunham & Kearfoot;" and informed him also of the fact, more important to his principals, that the debt had all been paid. Mr. Simpson added, that he had felt himself under special obligation to pay the debt, as Dunham & Kearfoot had been good friends of his firm; that he had been repeatedly written to by them to pay up the amount due; that he had been trying to get exchange; that he had been waiting till the return of a certain debtor, whom he named; and for the payment of some other debts, so as to get exchange cheaper; and "that he hoped the attachment of McKinney would not catch what he had sent on to Baltimore."

Jones finding out otherwise that his letters had been

opened, *re*-sealed, and that he had not been told of this, and apparently put out at losing a piece of business that might have been remunerative, declared himself "astonished." And the Baltimore firm of Dall, Gibbons & Co., conceiving that they had lost their debt wholly from Duff's having got possession of the letters, and in consequence of the knowledge which he had acquired by opening and reading what was not intended for him, now sued *his* firm, Simpson, Duff & Co., of Rogersville.

The declaration set out the existence of the debt, the writing of the two letters, that Duff, a member of the firm, "took the same from the post-office without any authority for so doing, and opened and read them, and had thus illegally, wrongfully, and fraudulently acquired a knowledge of their contents, and *communicated the same to the other members of his firm.*" And it averred, that after the firm had in this way obtained information of the intention of Dall, Gibbons & Co. to attach the debt, the said Simpson, Duff & Co. wrongfully, illegally, and fraudulently *detained* the letters aforesaid, and illegally and fraudulently failed, for eight days, to forward or to deliver the same to the said Jones; with the purpose, design, and intention of preventing them, the plaintiffs, from obtaining payment of the notes due them, and for the purpose of favoring Dunham & Kearfoot aforesaid. By means of which tortious act and several grievances, and by reason of the insolvency and bankruptcy of the said Dunham & Kearfoot, which occurred soon after, they, the plaintiffs, had lost the whole amount of their debt.

Mr. Duff, however, for himself and his firm, had also an account to give of the transaction. This account appeared partially in the testimony of Mr. Cocke, the attorney in Baltimore, who had written and sent the letters, partially in the testimony of Mr. Jones himself, and partially in a letter of Duff's own, written in reply to one which Mr. Jones had written to *him*, complaining of what Duff had done about the letters, and which letter of Duff's, in vindication of himself, Jones had made evidence by referring to.

Mr. Cocke, the attorney, stated that the claim had been sent to Mr. Jones, "*because* his intimacy and relationship with Simpson, Duff & Co. would enable him to *ascertain from them* the amount of *their* indebtedness to Dunham & Kearfoot."

Mr. Jones gave more full particulars.  He testified that before studying law he had been a clerk in the house of this same Simpson, Duff & Co.; that Simpson had married his first cousin, and that he and Duff had "always, for years, been upon the most intimate terms of friendship;"—one evidence of which he signalized in the fact mentioned by him, that while he was at college " he had carried on a correspondence with a young lady through the defendant Duff, and had *authorized Duff to read his letters before giving them to the young lady.*"   He mentioned, also, the fact, that after the occurrence about the letters, he, Jones—as yet knowing nothing about it—had seen Duff constantly, and " for a part of the time slept with him at night."   He stated, also, that Duff had " for years been authorized to take his letters out of the post-office at Rogersville, and to forward them to him when absent;" though he declared solemnly that he had "*never authorized him to open his business letters* during his absence."

The postmaster, too, of Rogersville, testified that it was his general practice, and had been for years, to put Mr. Jones's letters into the box of Simpson, Duff & Co.; that Duff boarded with him, the postmaster; and Jones himself testified, that had he been in Rogersville when the letters came, he *would* have gone directly to Mr. Simpson and told him about them; adding, " I *think* this from my intimacy with him, and from some directions to that effect in the letters themselves."

The letter of Duff to his friend of so many years was thus, in substance and material parts, expressed:

ROGERSVILLE, 8th July, 1858.

DEAR JONES:

Yours is to hand; and but for my absence from home, at the time of its arrival, should have had an earlier notice.   I have

only to say, it is true I opened the letter referred to. In so doing I was actuated by none other than pure motives. The letter was from a place I believe you had no private correspondence with, and at the time, it occurred to my mind that it might be a business letter, and one that demanded prompt and immediate attention. This was the only reason I had for the act. Owing to the very friendly relations that had always existed between us, and feeling a lively interest in your welfare, I thought I might safely take this liberty, and in taking it I was prompted alone by the feeling of doing what I supposed would be of service to you in your absence. When I found that the letter was connected with *our* business, I mentioned it to Colonel Simpson, your relation, and my partner, who expressed himself very sorry that it had been opened. I then resealed and forwarded it to you at once. If *I committed an error, it was in not then informing you what I had done; this, however, was an error of omission only.* Before opening the letter, I had no knowledge or intimation of its contents. You say you are "astonished" at it. I am surprised that you should express astonishment, in view of our long intimacy, and in view of the fact that I have for so many years taken out your letters from the post-office at your request, and forwarded them to you, when you were absent from Rogersville, as you were when I opened the letter. I sincerely thought I was doing right, and for the promotion of your interest. It distresses me to learn, from the disapprobation implied in your letter, that you condemn an act, which, had it been done by yourself under similar circumstances, I would not have censured. The fact that I opened the letter, did you, I trust, no harm, nor your client. I forwarded it at once, on finding, as I did, most unexpectedly, that the letter contained claims sent out in behalf of Dall, Gibbons & Co., against Dunham & Kearfoot, which they desired to secure by attaching a debt due from us to the house last named. When I first saw the letters, I did not know how long they had been in the store—and seeing two letters with the name of G. W. Howard & Co. stamped on the envelopes, it occurred to me that they were business letters of importance, and required immediate attention; knowing that Howard & Co. did a considerable business in this section of the country, and not for one moment supposing that the business could have any connection with our house, as we at the time did not owe them anything. I knew, also, that Mr

Cocke, a member of the firm of G. W. Howard &. Co., was a relation of yours, and it was natural for me to suppose that business from them would be placed in your hands, when they needed an agent at this point.

I have reason to believe that Dall, Gibbons & Co., hearing that you had removed to Alabama, engaged the services of Colonel McKinney, and that he was at Knoxville, endeavoring to obtain an injunction as you came up from Alabama with the claims. If the business was transferred into his hands before you reached Rogersville, and when, as a citizen of Florence, you could not be expected to attend to it, I am really at a loss to perceive how my intended kindness can have operated to your prejudice, as we were making arrangements, and using every effort to settle our indebtedness to Dunham & Kearfoot, before we had any intimation of Dall, Gibbons & Co.'s claims.  I repeat, however, that I am sorry this thing has occurred, and hope that this explanation will prove satisfactory, and that our former friendship may still remain unchanged.  I trust I shall hear from you soon.

Your friend, truly,

J. M. DUFF.

To sustain the plaintiff's case it was necessary, of course, to prove that the two letters had been written.  Mr. Jones proved that he had received two letters inclosing the notes; describing the letters.  The record then went on in substance thus :

" On the witness being asked to produce the letters, he stated that when he left Florence, a few days before this trial—for the purpose of attending as a witness—he *looked over* his papers for all such documents as related to this case.  The letters were not among his papers.  The witness recollects thinking about the two letters during the time he was looking over his papers; but being under the impression, that when the declaration was filed in this case, he had left them with J. R. Cocke, the plaintiffs' attorney, he did not make any special search for them more than for the other documents.

" The attorney, Cocke, being then introduced by plaintiff, testified that he *had* had the letters in his possession, while he was drawing the declaration in this case, but was under impression

that he had returned them to Jones. The witness had *not** ex-
amined his files of letters before the commencement of this term
of the court, in getting his papers together for the trial, and
had not found said letters; and not finding them among *the
other* papers in his possession, he had supposed the witness
Jones had them.

" Upon this testimony the court permitted Mr. Jones to go on
and testify as to his recollection of the contents of the letters;
to which action of the court, in allowing secondary evidence
while the existence of better evidence was shown, the defen-
dants *except*.† The witness Jones *then* went on to testify that
one of the letters was dated Baltimore, 16th March, 1858, and
the other, Baltimore, 17th March, 1858; that one of them con-
tained two notes, drawn by the firm of Dunham & Kearfoot,
*dates and amounts not recollected;* that one of the notes was due
at the time it was sent to witness; that the other note was not
due, but would shortly fall due. In one of the letters there was
a statement of the amount due from Dunham & Kearfoot to the
plaintiffs, Dall, Gibbons & Co. But the *amounts and particulars
of that statement the witness was unable to remember.*"

By the statutes of Tennessee, it should here be said, the
property *in* Tennessee, of debtors non-resident within the
State, is allowed to be attached only when such "non-resi-
dent debtor shall be removing, or about to remove, his
property beyond the limits of the State."‡

The record went on in substance thus:

" The court, among other *things not excepted to*, charged the
jury in effect, as respects material parts, as follows:

" 1st. That this debt was property within the meaning of the
statutes of Tennessee; and that if the defendants were about to
remove their property beyond the limits of the State, the plain-
tiffs would have had the right to attach it; that if the defen-
dants, by arrangement with insolvent creditors, intended to pay
portions of their debts, and convert other parts into negotiable
securities, so as to defeat the power of the plaintiffs to collect
their debts from such insolvent non-resident creditors, who were

---

\* *Sic*, in the printed record.
† *Sic, i. e.* in the present tense, in the printed record.
‡ Sessions Acts of 1855–6.

plaintiffs' debtors, such conduct would amount to a removal of the property from the limits of the State, and if such measures were in contemplation, the plaintiffs would have the right to attach such indebtedness, to prevent its removal and secure their debt.

"2d. That authority to forward a letter is not an authority to break it open; that if, even with good motives, the defendants broke open the plaintiffs' letter to their attorney without authority, it was a violation of the legal rights of plaintiffs.

"3d. That if the defendants detained the letters thus broken open, with the view and purpose (as charged in the declaration) to enable them to use the information so illegally obtained, and pay the debt and convert it into negotiated securities, before the plaintiffs could issue their attachment and secure their debt, such detention, with such motives, was an illegal, wrongful, and fraudulent violation of the rights of the plaintifis, for which a right of action exists.

"4th. That in the event of the jury finding that the plaintiffs lost their debts by reason of the fraudulent conduct of the defendants, as above stated, and the insolvency of Dunham & Kearfoot, they would be entitled to recover the amount of their debts, such debts being not more than the amount due from Simpson, Duff & Co.

"5th. That all the partners who knew how the information was illegally and wrongfully obtained, and concurred in the subsequent acts to defeat the plaintiffs' attachment by payment to the insolvent debtors, were liable for the damages, and none but those who did."

A motion was afterwards made for a new trial, and the record went on in these words:

"The court overruled the motion for a new trial; *to all which action of the court the defendants except, and tender this their bill of exceptions, which is signed and sealed by the court,* and ordered to be made a part of the record in this case."

The case was now here on error: *Mr. Maynard, for the plaintiff in error, contending:*

1. That secondary evidence of the contents of the letters had been improperly received; there having, as he argued, been no sufficient proof of search for the originals.

2. That the charge was wrong; and that Simpson, Duff &

Co. were under no obligation to withhold from their creditor a debt which they justly owed him, and which he was pressing for, merely because they had accidentally become possessed of intelligence that somebody else wanted it held back for *their* benefit. Suppose they had accidentally or even designedly overheard a conversation instead of seeing a letter. Does any one think that in law they would have been bound to hold back payment?

*Mr. Browning, contra:*

1. Before passing to either of the objections, we note that no errors are assigned on this record. The plaintiffs in error say in this bill that they "*except*" to the decision of the court admitting secondary evidence of the contents of the letters; but it does not appear that any exception was taken when the decision was made and the trial was in progress. On the contrary, exception seems to have been first tendered after the motion for a new trial was overruled. Exception so taken cannot be availed of here. It is a well-settled principle that no bill of exceptions is valid which is not for matter excepted to at the trial. The original authority under which bills of exception are allowed, has always been considered to be restricted to matters of exception taken pending the trial and ascertained before the verdict. It need not be drawn out and signed before the jury retire; but it must be taken in open court, and must appear by the certificate of the judge, who authenticates it, to have been so taken. This was fully admitted in *Hutchins* v. *King*,* where the rule was only not insisted on through a clerical mistake. Nor is this a mere formal or technical provision. It was introduced and is adhered to for purposes of justice. For if it be brought to the attention of the court that one of the parties excepts to his opinion, the judge has an opportunity of reconsidering or explaining it more fully to the jury.

2. The counsel for plaintiffs in error has raised a question upon the ruling of the court in admitting secondary evidence of the contents of two letters.

---

* 1 Wallace, 60.

No general rule can be laid down upon this subject applicable alike to all cases. The proof necessary to establish the loss of a writing, so as to let in secondary evidence of its contents, must depend upon the nature of the transaction to which it relates, its apparent value, and other circumstances. If suspicion hangs over it, and there is any reason to believe that it is designedly withheld, a rigid inquiry should be made into the reason of its non-production; but if there is no such suspicion, all that ought to be required is reasonable diligence to obtain the original—in respect to which the courts extend great liberality.* In this case, the search for the originals might have been more thorough and rigid; but reasonable diligence was used, and there is no reason to suspect they were intentionally withheld.

But however this may be, the evidence of their contents was given to the jury without objection, and the question of its admissibility cannot now be raised here.

3. Objection is made to the charge of the court. Is the charge really open to censure?

Mr. Jones testifies that he never gave Duff authority to open his business letters. There is no evidence that Duff had such authority. What a college boy chose or did not choose to do a half century perhaps ago, and on one of those occasions when it is not given to men to be wise, is a small affair; of no pertinence to the case. If certain letters were submitted to him open, it does not follow that he had a right to break open others not submitted. No purpose that Duff in his letter states as having animated him was to be answered by opening and reading the letters instead of forwarding them. He saw the card of Howard & Co. on them, and could have replied to them that the letters were forwarded. He pretends to wish to serve his friend, and does it by depriving him as fast as possible of a valuable piece of business.

But the gravamen of our charge is less here than in that

* Williams v. United States, 1 Howard, 299; De Lane et als. v. Moore et als., 14 Id. 265; Juzan et als. v. Toulmin et als., 9 Alabama, 663; Jones et als. v. Scott, 2 Id. 61.

Duff communicated his irregularly obtained knowledge to Simpson, the leading and senior member of his firm. He had assuredly no authority to do *that.* Duff's duty, when becoming accidentally possessed of information not intended for him, was to forward the letters as fast as possible, with an explanation to Mr. Jones, and to keep profound silence as to everybody else. If under those circumstances Simpson, or the firm generally, had gone on to pay the debt before an attachment bound it, we might, perhaps, have less to say. But here the debt was discharged in the way that it was, and with the haste that it was, obviously, in consequence of the information given by Duff to his co-partner. Dates show this. Mr. Simpson is " very sorry" to hear that the letters had been opened, and shows his extreme sorrow by profiting as fast as possible of the knowledge that through their being opened he had acquired. He went to work immediately to defeat the attachment; sending all the cash and drafts that he had, and then to make short, clear, clean, and conclusive work of it, the firm's own *negotiable* note for a balance that he could not pay in cash. The note did not *pay* the debt; and the only purpose of sending it was to put the debt in a form not susceptible of being attached.

As matter of fact, there is no doubt at all that it was in consequence of Duff's opening and reading of the letter, and *consequent communication of its contents to Mr. Simpson,* that our claim was lost.

Mr. Jones's statement of what he might, could, or would have done, *if* he had been at Rogersville—he not having been there—is of no value. It is based on a hypothesis non-existent, and is more than any man ought, perhaps, to state on his oath. In fact, Jones says that he only "thinks this." Certainly, as a professional man, it would have been the least prudent thing that he could have done. It is not to be presumed of him that he would have so acted.

The instructions of the court, then, were substantially right. Taken as a whole, they presented the case fairly on both sides, and could not have misled the jury as to the

issues they were to try, or the principles by which they were to be governed.

But it is a sufficient answer to say that no exception was taken to them when given, and that, therefore, this court will not review them.

*Reply to the first point.* The bill of exceptions, we may admit, is not well drawn; but it is plain enough that the exception was taken *before* the witness was examined. It says, indeed, that the plaintiffs "except" to the action of the court in allowing the secondary evidence. But it proceeds straight to add, "the witness, Jones, *then* went on to testify;" showing that the exception was taken before the testimony was given; and that though, in a present tense, the term relates to a past transaction. All that this court cares for is the fact; if it was properly taken, the omission to state it in the best way is not important.*

Mr. Justice DAVIS delivered the opinion of the court.

It is contended by the defendants in error that the rulings of the Circuit Court, which are alleged to be erroneous, were not saved during the progress of the trial, and cannot, therefore, be investigated here. If this was so, it would be fatal; but we do not *thus* interpret the record. It is well settled that bills of exception are restricted to matter which occurred during the progress of the trial; but it is not necessary, neither is it the practice, to reduce to form every exception as it is taken, and before the trial is at an end. It will do for the judge to note them as they occur, and after the trial is over, if it is desirable to preserve them, they can be properly embodied in a bill of exceptions. In this case the bill of exceptions is unskilfully drawn, and is justly subject to criticism; but it clearly enough appears that the rulings of the Circuit Court, which are sought to be reviewed here, were excepted to in proper time, and when the cause was on trial, and not afterwards.

---

* Hutchins *v.* King, 1 Wallace, 60.

If this is so, we cannot allow a valuable right to be defeated, because the judge carelessly used a word in the present tense, when the true expression of his meaning required the use of a word in the past tense.

It is a fair inference from the bill of exceptions that the defendants excepted to the introduction of secondary evidence of the contents of certain letters, when the court decided to admit it; and it is an equal inference that they also excepted, before the jury retired from the bar, to each of the series of instructions which the court gave to the jury. The bill of exceptions. is, therefore, valid, and brings to our notice the proceedings of the Circuit Court, which, it is asserted, are erroneous.

The theory of this action is, that the defendants in error, who resided in Baltimore, Maryland, in March, 1858, addressed two letters to Jones, an attorney-at-law, in Rogersville, Tennessee, which, in his absence, were opened and read by Duff, one of the plaintiffs in error, and their contents communicated to his copartners, and then were detained for the purpose of obstructing the defendants in error in the prosecution of an attachment suit against the indebtedness which the plaintiffs in error owed to Dunham & Kearfoot, a mercantile firm, also resident in Baltimore. These letters were not produced on the trial, and the court permitted Jones to testify as to his recollection of their contents. This action of the court was excepted to, because no sufficient evidence of their loss had been made to justify it. The best evidence in the power of the parties must always be furnished, and the court was not authorized to allow secondary evidence of the contents of these letters to go to the jury, unless it was shown that they were either lost or destroyed.

The well-settled rules of evidence require this, and the danger of departing from them is well illustrated in this case; for on the important point of the dates and amount of the notes the testimony of the witness was imperfect, and wanting in clearness and precision. In order to show the

loss of the letters, it was necessary to prove that a diligent search had been made for them where they were most likely to be found. There is no general rule as to the degree of diligence in making the search; but the party alleging the loss is expected to show " that he has, in good faith, exhausted, in a reasonable degree, all the sources of information and means of discovery which the nature of the case would naturally suggest, and which were accessible to him."*

In the case before us this plain rule of evidence was palpably violated; for there was no diligence whatever used to obtain the letters, and no such search as would justify the court in inferring that they were lost.

J. R. Cocke, the attorney, went to the place of trial, under the belief that Jones, who was to be a witness, had the letters and would bring them. Jones was in the same category. Neither had made any special search for them, for each rested in the conviction that the other was the custodian of them. It was a case of pure negligence, and should have been so treated by the court. To approve the ruling of the court would justify the admission of secondary evidence on the merest pretence, and would do away entirely with the necessity of producing primary evidence. We cannot countenance a practice so loose, and such a manifest departure from the plainest legal principles.

The decision on this point remits the cause to the Circuit Court; but as it may be tried again, we are called upon to go further and decide the merits of this controversy, as they are involved in the instructions which the court gave to the jury.

Among other things, the court substantially charged the jury, that if Simpson, Duff & Co. were about to remove their property beyond the limits of the State, Dall, Gibbon & Co. would have the right to attach it, and that they could not pay their debt to Dunham and Kearfoot, who were insolvent,

---

* 1 Greenleaf on Evidence, § 558.

so as to defeat the measures which Dall, Gibbon & Co. had in contemplation to prevent it. Such a doctrine as this would effectually destroy credit and commerce.

If Simpson, Duff & Co. were indebted to Dunham & Kearfoot, they surely had a right to pay them, and the court will not inquire into the motive which prompted the payment. But the motive was meritorious, for the law does not favor a partial appropriation of an insolvent debtor's effects, but prefers an equal and general distribution. When the debt was contracted in Baltimore, both parties contemplated that, in the usual course of dealing, remittances or negotiable securities would be sent from Tennessee to discharge it, and it would be singular if the fact that *Simpson, Duff & Co.* were about to remove *their* property from Tennessee, in order to comply with their agreement, should authorize the issue of an attachment.

The mere statement of the proposition is enough to show its fallacy. Dall, Gibbon & Co. had no claim against Simpson, Duff & Co. The relation of debtor and creditor did not subsist between them, and we cannot see why it was necessary for these last to procure the consent of Dall, Gibbon & Co. before they could send money and negotiable notes to pay in good faith an honest debt, due to a mercantile firm residing in Baltimore, which was contracted there, and in the usual course of trade must be paid there.

But it is necessary to discuss the evidence in the case, as the charge of the court assumed that there was a cause of action. Duff and Jones were intimate friends, and to a degree not often seen, for Duff was permitted to open and read certain letters written by Jones, which are not generally read by third persons. Duff had for years been authorized to take the letters of Jones out of the post-office at Rogersville, and to forward them when he was absent, and the postmaster always put them into the box of Simpson, Duff & Co. Jones and J. K. Simpson (the active member of the firm) were connected by marriage; and Cocke, who wrote the letters from Baltimore, was also his relative, and a member of the firm of G. W. Howard & Co., whose name

was stamped on the envelopes.  This fact Duff knew, and as his house had no dealings with Howard & Co., it was very natural for him to suppose that the letters were on business requiring prompt attention, which, as an act of kindness, he ought to give to it, during the absence of Jones.

Cannot Duff's authority to open these letters be fairly inferred from these circumstances, and who can say that he erred in doing so?  It is true that he committed an error in not informing Jones that he had opened them, but no harm resulted from that omission.  The *right* to open them cannot be affected by what occurred afterwards.  These letters were not detained, but were immediately resealed and forwarded to Florence, Alabama, where Jones lived.  There is absolutely no evidence raising a presumption even that they were withheld.  Duff was probably to blame for telling Simpson the purpose for which they were written; but he could hardly have refrained from doing so; and if he obtained the information rightfully, what principle of law or morals prevented Simpson, Duff & Co. from paying their Baltimore creditors, who had indulged them, and were then pressing them for payment?  If they had acted otherwise, they would have been justly censurable.  Their obligation was to Dunham & Kearfoot, not to Dall, Gibbon & Co., and the information obtained simply hastened the payment of an overdue debt, which they had for some time been endeavoring to procure exchange to discharge.

But if Duff had not opened the letters, is it not manifest that Jones, on his arrival in Rogersville, would have communicated their contents to Simpson?

Jones swears that he would, on account of their intimacy, and because Cocke had directed him to do so.  And if Dall, Gibbon & Co. authorized their attorney to consult Simpson, and give him the same information which Duff did, how can they complain of the *manner* in which the information was obtained?

The procurement of Cocke, who had nothing to do with the matter, to select an attorney in Tennessee, who was his

relative and also a relative of one of the Simpsons, was a contrivance to obtain more surely and easily the information on which the proceedings in attachment could be founded. The scheme was a failure, and Dall, Gibbon & Co. have no just right to complain. They are in no proper sense the losers by the conduct of Duff. The result would have been the same if Jones had got the letters unopened, for he would have told Simpson what he wanted; and it is easy to see that, instead of responding to his request, the firm would, in obedience to a plain sense of duty, have paid their just debts to their own creditors.

On what basis, then, can this claim be sustained? The examination of the record discloses none, and we are unable to supply the omission.

The judgment of the Circuit Court is reversed, and a

NEW VENIRE AWARDED.