CONTINENTAL OIL COMPANY, the Atlantic Refining Company, Tidewater Oil Company, and Cities Service Production Company, Libelants,

v.

M.S. GLENVILLE, Her engines, etc., Respondent.

SKIBS A/S SOLSTAD (A. F. KLAVENESS & CO., A/S), Cross-Libelant,

v.

CONTINENTAL OIL COMPANY, the Atlantic Refining Company, Tidewater Oil Company, and Cities Service Production Company, Cross-Respondents.

No. 2092.

United States District Court
S. D. Texas,
Galveston Division.

Aug. 24, 1962.

Fulbright, Crooker, Freeman, Bates & Jaworski, Joseph Newton and Sweehey J. Doehring, Houston, Tex., for libelants and cross-respondents.

Royston, Rayzor & Cook, Bryan F. Williams, Jr., Galveston, Tex., for respondent and cross-libelant.

HANNAY, District Judge.

*Findings of Fact:*

The Continental Oil Company, The Atlantic Refining Company, Tidewater Oil Company, and Cities Service Production Company, Libelants, bring this suit in admiralty against the MS GLENVILLE, Her engines, tackle, apparel, etc., as Respondent, for the sum of $800,000.00.

The Respondent was and is owned by the Skibs A/S Solstad (A. F. Klaveness & Co., A/S), who is Cross-Libelant here.

On December 4, 1959, Libelants were the owners of a drilling and production platform known as Platform B located in the west one-half of Block 208 in the Eugene Island Area in the Gulf of Mexico about 40 miles from Lake Charles, Louisiana. Between 11:00 and midnight on that date, while the said MS GLENVILLE was attempting to navigate en route from Tampa, Florida, bound for Lake Charles, it collided with Platform B with resulting damages to both. At this time only the question of liability is to be determined.

Platform B was approximately 146.7 feet long and 52 feet wide and stood 53 feet high off of the water.

The MS GLENVILLE was and is an ocean-going general cargo ship of 6,320 gross tons, 474 feet 7 inches long with a breadth of 59 feet and a depth of 39 feet, and powered by one propeller and one Stork diesel engine. At the time of the collision the night was clear but dark and the sea and wind were calm and the visibility was good. The ves-sel was lightly loaded and traveling at about 16 knots per hour. The Master had only been on the GLENVILLE since the middle of November in 1959. Radar, although in operative order, was not being used at the time of the collision. The Third Mate testified that they had been using radar earlier that night and commenced using it again immediately after the collision. Surely, if radar which was capable of picking up a small object for some 7 or 8 miles was being employed immediately before the colli-sion, it would have detected the large platform' miles before the vessel reached the platform.

The Master was in the wheelhouse at the time of the collision; there was no lookout on the bow of the ship, nor had there been for at least 15 minutes before the collision. Neither the Master nor anyone else on board the vessel had the latest chart of the area through which the ship was passing. The chart they did have was not correct, in fact, was some three years of age and since that time a great many platforms or other structures had dotted the area through which the ship was being navigated. The latest charts showed the exact location of Platform B. In fact, there were some 700 platforms and drilling rigs on the Gulf Coast of Louisiana in that vicinity.

Libelant's basic contentions of fault and neglect on the part of the MS GLENVILLE and those in charge of her navigation, which resulted in the collision and damages, are:

1. She failed to keep any or any proper lookout;

2. She failed to properly utilize her radar equipment; and

3. She failed to properly carry charts and public notices with respect to the area in which she was navigating.

Respondents answer and say that the collision and resulting damages were not caused or contributed to by any fault or neglect on the part of MS GLENVILLE, but were caused and due solely to the fault and neglect of the owners of Platform B, and particularly in failing to install and keep in operation proper lights aboard the platform. They also filed a Cross-Libel against the Libelants for the sum of $200,000.00, which they say was the result of the collision in question.

I find as a fact that the MS GLENVILLE at immediately before the collision in question was not keeping a proper lookout and that this omission was a grave error and resulted, at least in part,

to the accident in question. This omission is admitted.

I further find that this failure to keep a proper lookout at the time and under the circumstances was of such a nature that it is entitled to be treated as the equivalent to a statutory fault. Proof of this fault is clear and indisputable.

I further find as a fact that the MS GLENVILLE, and those in charge of her navigation at the time and place in question, were not using her radar. This, too, is conceded. I find that this was a gross fault and contributed in whole or in part to the collision. Another boat, to-wit, Gulf King, on that same night passed within about 2 miles of Platform B without mishap and was using radar with a range of about 8 miles. To attempt to navigate in a situation at night without the use of radar when it was available constituted a gross fault. Failure of those in charge of the navigation of the vessel to make intelligent and reasonable use of the dependable radar equipment that they had at their disposal was negligence and inexcusable.

■ I, therefore, find as a fact that the vessel and those in charge of her navigation committed the following acts of negligence, to-wit: failure to keep a proper lookout, failure to have a correct chart, and failure to use her radar, each of which were active faults, were each admitted, and were of such major importance as to constitute serious faults, and were so inexcusable that same jointly and severally directly caused the collision in question.

I further find that at or immediately before the collision in question, the lights upon Platform B were of a sufficient intensity and brightness to be seen approximately 4.4 miles. While this may not have actually complied with the Coast Guard regulations of lights capable of being seen 5 miles 90% of the nights of the year, the fault was minor and technical when taking into consideration the faults of the vessel above set out. If any one of these three omissions on the part of the GLENVILLE had not occurred, then surely the lights that were burning upon Platform B immediately before the collision in question could have been seen and should have been seen for at least 4 miles, and considering the rate of speed which the vessel was traveling, if it had knowledge of the platform's location, even as much as *one-half mile* before the collision, it could have easily avoided smashing into it. The fact that at least 2 of the lights on the platform were burning brightly after the accident on the morning thereafter clearly demonstrates that such lights were being shown on the platform at the time of the collision. Other facts that tend to show that the lights were burning were the Master's negative testimony in which he stated:

"I couldn't see any lights." (p. 87)

"I don't know if there were any lights on. I didn't see any." (p. 88)

His failure to see was the result of his failure to look.

In the case of Republic of the United States of Brazil v. The M/V "Markland", 5 Cir., 290 F.2d 165, at page 166, Circuit Judge Hutcheson, a wise jurist with vast experience in admiralty matters, wrote:

"What we have here is the usual fact that each witness has uniformly sworn in favor of his own ship."

*Discussion:*

The main question for decision is whether in this case the damages should be divided or should be assessed solely against one of the parties hereto. In considering this question, it is well to remember the following legal principles.

■ There is a presumption that when a moving ship collides with either a vessel at anchor or with a stationary or fixed object, there is not only a presumption in favor of the anchored vessel or stationary object, but a presumption of fault on the part of the moving vessel which shifts the burden of proof. See The Oregon, 158 U.S. 186, 187, 15 S.Ct. 804, 39 L.Ed. 943 (1895) and The Virginia Ehrman, 97 U.S. 309, 315, 24 L.Ed.

890 (1878). To the same effect is Coyle Lines v. United States, 195 F.2d 737, (5th Cir., 1952). Griffin on Collisions on pages 348 through 351 correlates a number of decisions with reference to this point.

The three specific faults alleged and proven against the GLENVILLE have already been mentioned and will be discussed in detail later in this opinion.

The so-called Pennsylvania Doctrine, first declared in The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148 (1874), is as follows:

"When, as in this case, a ship at the time of a collision, is in actual violation of a statutory rule intended to prevent collision, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been."

In Green v. Crow, 5 Cir., 243 F.2d 401, at page 403, Circuit Judge Jones, in discussing the Pennsylvania rule, held:

"This rule is *not* a rule of liability. It creates a shifting of the burden of proof as to *causation*. The Aakre, 2 Cir., 1941, 122 F.2d 469, certiorari denied Waterman v. The Aakre, 314 U.S. 690, 62 S.Ct. 360, 86 L.Ed. 552. Where neither vessel has strictly complied with the statutory rules, and such is the case before us, we have said that

"'All of these presumptions, in the final analysis, are mere aids to the court in getting at the *right* of the matter, and their relative weight must depend upon the circumstances of the *particular case.*' Coyle Lines v. United States, 5 Cir., 1952, 195 F.2d 737, 739." (Emphasis supplied)

Supplementing that presumption is the analysis of the phrase used therein, "could not have contributed to it." Pa-

cific Tow Boat Co. v. States Marine Corp. of Delaware, 9 Cir., 276 F.2d 745, when on page 749 the court wrote:

"Under this rule the vessel guilty of violating a statute or regulation pertaining to equipment or navigation must, in order to escape liability, prove not only that the fault shown probably did not contribute to the collision but also that it could not have contributed to it. The words 'could not have,' as used in this rule, do not require the vessel guilty of a statutory fault to prove that its fault could not by any stretch of the imagination have had any causal relation to the collision no matter how speculative, improbable, or remote. Seaboard Tug & Barge, Inc. v. Rederi, AB/DisA, 1 Cir., 213 F.2d 772, 775. But they do cast upon such vessel the burden of establishing that the violation could not reasonably be held to have been a proximate cause of the collision. States Steamship Co. v. Permanente Steamship Corp., supra, [9 Cir.] 231 F.2d [82] at page 87."

■ The test as to whether the major-minor fault rule should apply is concisely stated in Griffin on Collisions, at page 506, as follows:

"If, as a result of *all* the evidence it appears that the *real* cause of the collision was a grave misconduct of one vessel and that the fault of the other was doubtful or very slight, the principle under discussion may be applied." (Emphasis supplied)

Circuit Judge Edwin Holmes in the case of Compania de Maderas, etc. v. The Queenston Heights, 220 F.2d 120 at page 123 (5th Cir., 1955), certiorari denied Esso Shipping Co. v. Compania de Maderas, etc., 350 U.S. 824, 76 S.Ct. 52, 100 L.Ed. 736, in discussing the major-minor fault rule, used the following langauge:

"Where the gross negligence of one vessel is wholly sufficient in itself to account for the collision, but the other vessel has committed a

*technical* fault not shown to have contributed to the collision, and where the error of the latter is *minor,* doubt as to the latter's conduct will be resolved in her favor. Griffin on Collisions, p. 505. Furthermore, where the *active* fault of one vessel so flagrantly and heavily outweighs the *passive* faults of omission of the other vessel, the interests of justice are best served by condemning the more culpable vessel *completely*. The Great Republic, 23 Wall. 20, 90 U.S. 20, 23 L.Ed. 55; The Lord O'Neil, 4 Cir., 66 F. 77." (Emphasis supplied)

Considering now one of the specific basic faults charged against the GLENVILLE by the Libelants, that of the alleged fault to keep a proper lookout. It is conceded by the proctor for the Respondent that at the time and for at least 15 minutes and perhaps 17 minutes before the collision, the seaman who had been on duty as a lookout on the bow was absent from his post of duty. This fault was a grave and, in fact, a gross one. Had there been, and there should have been such a lookout, and if he had been alert and attentive, he would surely have seen Platform B in time to have given the proper warning which would have resulted in avoiding the collision. This fault was a major fault and certainly actively contributed to the collision.

In Anthony v. International Paper Co., 4 Cir., 289 F.2d 574, at page 580, that court said:

"It has been held in a number of decisions in the Second and Fifth Circuits that failure to have a proper lookout is a *statutory* fault or, in any event, is such a grave default in careful navigation as to impose upon the ship the same obligation as rests upon one which has been guilty of a statutory fault. See Zigler Co. v. Barker Barge Line, 5 Cir., 167 F.2d 676; Smith v. Bacon, 5 Cir., 194 F.2d 203; Parker Bros & Co. v. DeForest, 5 Cir., 221 F.2d 377; Ulster Oil Transportation Corp.

v. The Matton No. 20, 2 Cir., 210 F.2d 106; Ira S. Bushy & Sons v. United States, 2 Cir., 172 F.2d 447; Gulf Oil Corp. v. The Socony No. 16, 2 Cir., 162 F.2d 869; Afran Transport Co. v. The Bergechief, 2 Cir., 274 F.2d 469; Dwyer Oil Transport v. The Edna M. Matton, 2 Cir., 255 F.2d 380." (Emphasis supplied)

In this connection see also Rule 29, International Rules, 33 U.S.C.A. § 147a; The Ottawa, 3 Wall. 268, 269, 272–273, 18 L.Ed. 265 (1866); St. John v. Paine, 10 How. 557, 585, 13 L.Ed. 537 (1850); The Genesee Chief, 12 How. 443, 463, 13 L.Ed. 1058 (1851); Coyle Lines v. United States, 195 F.2d 737 (5th Cir. 1952).

Having no lookout on the bow of the GLENVILLE as a matter of law was the same as having no lookout at all. Significant, too, is the failure of any of the crew members of the GLENVILLE to admit that they saw the flares which were so spectacularly in evidence for some time before and at the time of the collision. These flares were on the GLENVILLE'S starboard side and the platform was on its port side. It is indeed significant that Respondents did not produce the seaman who was supposed to keep the lookout nor have his deposition taken.

Taking up next the question of the failure of the Master of the GLENVILLE to have an up-to-date chart showing the structures in the Gulf of Mexico through which he was navigating. It is admitted that he did not have such a map, and in fact the one that he had was about three years old, having been issued in 1956, and was therefore obsolete. This up-to-date chart, particularly for a vessel navigating at night without a lookout and without the use of radar, was a vital necessity. This fault becomes more glaring when it is considered that a great many changes had taken place since the chart that he had was made some three years before. Also, he was not familiar with the topography through which he was attempting to

steer his vessel. He could have secured for $1.00 a current chart in Tampa, Florida, before embarking for Lake Charles. This up-to-date chart would have shown the location of Platform B. Had he procured this up-to-date chart, he would not and could not have been misled by the condition of the lights on Platform B or even the absence of lights, if such there was.

Also, Notice to Mariners issued weekly would have given him valuable information concerning the location of the many structures through which he had to pass en route from Tampa to Lake Charles. This opportunity he did not avail himself of. Where the Master had the means of obtaining this important information and failed to do so, he is deemed in law to know it.

It was a glaring fault and one that proximately contributed to the collision. See Davidson Steamship Co. v. United States, 8 Cir., 142 F. 315, aff'd 205 U.S. 187, 27 S.Ct. 480, 51 L.Ed. 332 (1907); Utility Service Corp. v. Hillman Transportation Co., 244 F.2d 121, 124 (3rd Cir. 1957).

Coming now to a discussion of the third act of negligence alleged by the Libelant against Respondent; that is, the GLENVILLE'S failure to use available radar under the circumstances immediately before the collision. This was indeed a gross fault. The GLENVILLE was equipped with Raytheon marine radar and it was in good operating condition and functioning properly. (See deposition of Buvollen, p. 64–5.) Its use would have revealed the presence of the platform ahead of her at any time after she came within 16 miles of it. (McCorquodale, p. 34.) Earlier that night she had actually used her radar in locating and passing Ship Shoal Buoy (2 SHIP) about an hour and 38 minutes before the collision. (See Wingsternes, p. 138.) Wingsternes also testified on page 138:

"Q. Mr. Mate, you told us that sometime after the collision you turned on your radar. Prior to that time, when was the last time you had used your radar?

"A. We used the radar when we passed the 2 ship buoy.

"Q. Was it turned off then or was it just not used?

"A. Well, it was turned off.

"Q. Why wasn't it used after that?

"A. Well, we didn't find it necessary.

"Q. Do you think it would have helped you in picking up some of these oil rigs, particularly if one of them had not been properly lit?

"A. Well, the radar picks up any big object."

Undoubtedly, the platform was a "big object." Strange indeed was the fact that the GLENVILLE used its radar to pass a known object and then discontinued it when it arrived in an area that it was totally unfamiliar with.

Historically, as far back as 1932, Judge Learned Hand in the T. J. Hooper case, 60 F.2d 737 (2nd Cir.), in discussing the use of radio by a vessel, held that the failure to be properly equipped with radio whereby she could have received storm warnings in time to put into port was "slack" and, therefore, rendered the vessel unseaworthy and was the direct consequence of an injury.

In Afran Transport Co. v. The Bergechief, 2 Cir., 274 F.2d 469, Circuit Judge Medina, in passing upon a question where radar had also been used earlier and then discontinued just before the collision, used the following language:

"The most interesting question in the case is that relating to the failure of the Bergechief to use her radar. We agree with Judge Levet that this was a fault and that it contributed to the collision. Moreover, we hold the Bergechief had the burden of proving that her failure to use her radar did not contribute to the collision, and it is clear beyond

peradventure of doubt that she did not sustain this burden."

Judge Medina then describes in detail radar's method of detecting objects and ascertaining their range, distance and bearing. He further held that there is an affirmative duty to use radar under certain conditions and wrote:

"Thus we conclude that the finding that it was a fault by the Bergechief not to use her radar and that this contributed to the collision will not be disturbed. And we hold further that in circumstances such as we have before us here the vessel that fails to use her radar has the burden of establishing that her failure to use radar did not contribute to the collision. That the Bergechief sustained no such burden in this case is too clear for reasonable debate."

(Also, it is significant that in this same case Judge Medina ruled that the absence of a bow lookout on the Bergechief was a *statutory fault.* p. 473.) (Emphasis supplied)

Judge Medina in the same case on page 475 said, pertaining to radar:

"A master has no more discretion to disregard this *aid to navigation* than he has to disregard the use of *charts,* current tables and soundings where the circumstances require the use thereof. The real question on this phase of the case is, would the radar have provided information of such a character as to have made it clear to the Bergechief that she should have reversed her engines and stopped her headway of some five knots sooner than she did." (Emphasis supplied)

In this connection Respondent's proctor cites the case of Bruce v. Debuse Barras Co., 5 Cir., 169 F.Supp. 90, on page 92 wherein Judge Skelly Wright wrote:

"* * * None of the cited cases go so far as to require the use of radar on a *small* boat on a clear night." (Emphasis supplied)

Certainly this does not mean that it is not required on a large boat and surely the GLENVILLE is big. I am firmly of the opinion that the failure to use radar immediately before the collision was such a gross fault that it is fair to say that if the radar had continued to have been used, the collision would not and could not have happened.

It is true that in the Afran Transport Co. case, supra, there was fog; however, I can see little difference between the vessel traveling in fog and one traveling in an area unknown to the Master which was densely populated with structures and when the ship failed to keep a proper lookout, use radar, or have an up-to-date chart.

Adverting now to Respondent's and Cross-Libelant's claim that the sole cause of the collision was because of the improper lighting on the platform at the time of the collision. A large amount of evidence was introduced by both sides. Libelants introduced some thirteen witnesses who claimed to have seen the lights either immediately before or soon after the collision in question from far distances. Also, each side furnished experts who testified at great length as to the strength of the lights and what could be the scientific result in answer to many hypothetical questions.

From all of this testimony I have concluded that the lights upon Platform B at and immediately before the collision were of sufficient intensity and brightness to be seen approximately 4.4 miles, and that being so, surely the GLENVILLE could have and should have seen the platform in ample time to have avoided the collision. That distance, according to the Master of the GLENVILLE, was a distance of some 1000 yards or about ½ nautical miles. It therefore follows that the technical differences in the amperage rating between the lamps on the platform and those the GLENVILLE says should have been is so slight as to be immaterial. The important point is that the lights on the platform were burning with sufficient intensity as to be clearly visible for such a distance

as to have allowed the GLENVILLE to have avoided the collision had the GLENVILLE not been negligent in failing to keep a proper lookout, in failing to continue the use of radar, and in failing to provide and use an up-to-date chart of the area. All of these, a combination of two, or any one standing alone, was in my opinion sufficient to have caused the collision, and in fact did so cause it. The great flare on Rig Offshore 54 on the GLENVILLE'S starboard side may have so attracted the attention of those who should have been keeping an alert lookout and who should have been using radar as to have caused the collision, and this is particularly so since the GLENVILLE committed a glaring fault of not having an up-to-date chart.

■ If the lights had not been quite up to the Coast Guard regulations or even if the lights had been dim, certainly the proper use of radar would have discovered the platform and this is true even if there had been no lights at all, but this defect in lights plays no effective part in the collision. There was no causal connection in the absence of the required lights and the collision. Without causal connection the absence of lights even would not have been material. See Coyle Lines v. U. S., supra, and Smoot Sand & Gravel Corp. v. Baltimore Steam Packet Co., 102 U.S.App.D.C. 97, 250 F.2d 422, at page 424:

"*  *  * Whether there was any causal connection between the absence of some required lights and the collision is not shown on this record. Without causal connection the absence of the lights would not be material."

*Conclusions of Law:*

I conclude as a matter of law:

1. That this court has jurisdiction of the subject matter and of the parties to this suit.

2. That the GLENVILLE was at fault in failing to keep and maintain a proper and vigilant lookout.

3. That the GLENVILLE was at fault in failing to have the location of Platform B marked on an up-to-date chart by which she should have been navigating.

4. That the GLENVILLE was at fault in not using her radar at and immediately before the collision.

5. That each of the faults mentioned in 2, 3 and 4 above were grave, gross and glaring, and each of said faults actively contributed to the collision and were the true, sole, direct and proximate cause or causes thereof.

6. That each of the faults described in 2, 3 and 4 above were of a major nature and were established clearly by undisputed testimony.

7. That Libelant's fault pertaining to lights was passive, technical, not substantial and so slight as to be disregarded inasmuch as it could not and did not contribute to the collision. This Libelant proved conclusively.

8. I therefore conclude that the collision was solely caused by the faults of the GLENVILLE and that the GLENVILLE should be compelled to bear all the damages of Libelant herein, including costs of court.

9. The cross-libel of Respondent should be and hereby is dismissed.

10. Let appropriate decree be presented in accordance herewith.

11. Clerk will notify Counsel.