STANDARD DREDGING CORPORA-
TION, a body corporate,

v.

S/S SYRA, her engines, boilers, etc.

v.

UNITED STATES of America

v.

J. L. DAVIS, Pilot, and Standard
Dredging Corporation.

Adm. No. 4460.

United States District Court
D. Maryland.

Oct. 2, 1968.

John H. Skeen, Jr., Baltimore, Md., for Standard Dredging Corp.

Randall C. Coleman, Baltimore, Md., for S/S Syra and her claimant.

Stephen H. Sachs, U. S. Atty., Baltimore, Md., and Harold G. Wilson, Atty., Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., for the United States.

J. Cookman Boyd, Jr., Baltimore, Md., for Davis.

THOMSEN, Chief Judge.

The original libel in this case was filed by Standard Dredging Corporation, owner of the Dredge Cartagena, against the S/S Syra to recover for damages to the pipeline of the dredge when it was struck by the Syra. The claimant of the Syra impleaded the United States, alleging that the collision was caused or contributed to by negligence of the United States in repositioning a floating buoy. The United States impleaded the Syra's pilot and libelant, and the Syra's claimant impleaded the pilot.

### Facts

Some of the facts are stipulated. The other facts stated below have been found after considering the credibility of the several witnesses, whose memories have been dimmed by the passage of time.[1]

---

1. The Court found the testimony of Government Inspector Westerfield most credible on the question of what lights were burning on the pipeline at the time of the collision.

The collision occurred at 0610 on December 31, 1962. The night was dark but clear. Visibility was good. A moderate gale of 40 knots was blowing from the northwest, and the sea was choppy. The temperature was seven degrees Fahrenheit.

The Brewerton-Fort McHenry Angle (the Angle) is the connecting channel between the Brewerton Channel, 600 ft. wide, leading toward Baltimore from the Chesapeake Bay at a bearing of 291, and the Fort McHenry Channel, also 600 ft. wide, leading to the Inner Harbor at a bearing of 321.

The Dredge Cartagena is about 170 ft. long and 48 ft. wide. At the time of the collision, the dredge was lying along the northeasterly edge of the Angle, approximately parallel to the edge, heading inbound, near the Fort McHenry end of the Angle and the entrance to a small channel leading northeast to the coal piers at Sparrows Point. The stern of the dredge was approximately 340 feet from the center line of the channel and the bow approximately 280 feet from the center line. The width of the Angle at that point is about 700 ft., so the stern of the dredge was lying across the northeasterly edge of the Angle. A section of pontoon pipeline described as the "first leg" extended directly from the stern of the dredge above the surface of the water southeasterly for a distance of about 150 ft. The next section, the "wing line", extended northeasterly from the first leg for about 350 ft. A "long leg line" extended from the end of the wing line east southeast parallel to the channel for about 2,550 ft. The dredge had been working along the northeasterly edge of the Angle since early December, and the pipeline had been extended as the dredge moved forward.

Buoy 4M is customarily positioned on the northeasterly edge of the Angle, at the southeastern (downstream) corner of the intersection of the Angle and the small channel leading to the coal piers, and near the point where the Angle meets the Fort McHenry Channel. The buoy was so located on the then current chart of Baltimore Harbor (C. & G.S. 545), but it was not at its charted location at the time of the collision, having been moved on December 24 to a position 200 yds. from its charted position, bearing 019 degrees. The buoy was moved by the Coast Guard at the request of libelant to permit continuation of dredging. The buoy remained lighted and continued to flash at regular intervals as it had done before. The new position of the buoy was southeast of the channel leading to the coal piers and 200 yds. northeast of the existing channel in the Angle.

Radio broadcast notice of the relocation of Buoy 4M was made by the Marine Operator, Norfolk, over 2538 KCs at 1800 on December 24, 1962, and at 1200 and 1800 on December 25, 1962. A similar broadcast notice was given by the Coast Guard Station, Portsmouth, over 466 CW at 2025 on December 24, 1962. On 2670 KCs, notice was given by NMN at 1222 on December 24, 1962, and by Fort Macon LBS, North Carolina, at 1201 on December 25, 1962. The Pilot Boat Baltimore, operated by the Association of Maryland Pilots, which is stationed near the entrance to the Chesapeake Bay and supplies pilots to vessels bound for Baltimore, regularly picks up such reports.

Written notice of the relocation of the buoy was published in Local Notice to Mariners No. 70, printed on Friday, December 28, in Portsmouth, Virginia. Copies of the publication were not received by the Coast Guard until Monday, December 31, sometime after the pipeline was struck. The Association of Maryland Pilots did not receive that publication until January 3, 1963.

The Syra is a jumboized Liberty ship of 8,634 gross tons, 492.8 ft. long and 57.1 ft. wide. At the time of the collision she was drawing 25 ft. forward and 26 ft. 6 in. aft. For some time before the collision, the Syra had been under the conn of Captain J. L. Davis of the Association of Maryland Pilots. Davis had piloted another vessel from Baltimore to the Capes on December 28, passing the dredge on his port side. After he joined the Syra on the evening of

December 30, her passage up the Bay was uneventful. As she came up the Brewerton Channel and entered the Angle, Davis was in the wheelhouse on the bridge, along with the helmsman and some of the Greek officers. The lookout was on the starboard wing of the flying bridge, with an open door between him and the pilot. A carpenter was stationed as an anchor watch forward but did not serve as a lookout. The strong wind and severe cold made it difficult if not impossible to hear whistle signals at any considerable distance and difficult for the lookout to see lights. The difficulty was aggravated by the low bridge of the Syra.

As the Syra turned to enter the Angle, Davis had seen and recognized the dredge, which he had passed on December 28, when her pontoon line was in essentially the same position as it was on the morning of December 31. Davis testified that as the Syra approached the dredge about 0600, he did not see any lights on any pontoons except on the first leg leading aft from the stern. In fact, however, there were kerosene lamps burning at intervals of not over 100 ft. along both the wing line and the long leg line. The crew of the dredge had used reasonable care during the night to keep burning both the kerosene lamps and the regular electric lights on stanchions above the wing line, but the wind and the rough sea repeatedly caused ice to form on the electric lines, pulling them from their sockets and breaking the bulbs, so that it proved impossible, by the exercise of reasonable care, to keep the electric lights burning.

Captain Davis could not see from his position which way the pontoon ran, and testified that he could not be sure which side of the channel the dredge was on. He saw the blinking Buoy 4M about 600 ft. from the dredge, and rashly concluded that the dredge must have been moved to the left side of the channel, the opposite side from that on which he had seen it less than three days before. Relying on the buoy, he attempted to pass the dredge on his port side, and did not see the pontoon line until he noticed a long gray line, which was the ice on the long leg line. He was then too near the wing line to stop safely. The course he had selected ran him aground along the northeastern edge of the channel. It should be noted that during the previous hour two other ships, which had passed North Point 15 minutes and 30 minutes respectively before the Syra, passed the dredge safely on their way to anchorages inside the harbor.

*Discussion*

When a moving ship collides with either a vessel at anchor or with a stationary or fixed object, there is not only a presumption in favor of the anchored or stationary object, but a presumption of fault on the part of the moving vessel which shifts the burden of proof.[2] Aside from that presumption, it is clear that the negligence of Captain Davis, attributable to the Syra, was a proximate cause if not the sole proximate cause of the accident.

(a) He did not determine his position by reference to the Fort McHenry range lights, which are recognized as the most reliable means of ascertaining one's position. Philadelphia Electric Company v. Curtis Bay Towing Company of Pennsylvania, 260 F.Supp. 505, 508 (E.D.Pa. 1966), affirmed 390 F.2d 125 (3 Cir. 1968); Canada S. S. Lines v. Great Lakes Dredge & Dock Co., 81 F.2d 100 (7 Cir. 1936); The Manhattan, 3 F. Supp. 75 (E.D.Pa.1932), affirmed per curiam, The Bessemer, 63 F.2d 995 (3 Cir. 1933); The Miles Standish, 1928 A.M.C. 215 (S.D.N.Y.). His excuse for not doing so—that the range lights were obscured by the dredge—is unacceptable,

2. The Oregon, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943 (1895); The Louisiana, 70 U.S. 164, 3 Wall. 164, 18 L.Ed. 85 (1865); The Victor, 153 F.2d 200, 1946 A.M.C. 431 (1946); Continental Oil Company v. M/S Glenville, 210 F. Supp. 865 (S.D.Tex.1962), and cases therein cited; Placid Oil Company v. SS Willowpool, 214 F.Supp. 449, 1963 A.M.C. 635, 638 (E.D.Tex.1963).

**264**

because they were not so obscured for long, and he could readily have moved or turned slightly to a position where the relatively small dredge would not have obscured the range lights.

(b) He did not utilize the radar, which was available to him, although he frankly conceded that the pontoon line would have shown on the radar. If, as he claims, the range lights were momentarily obscured, and if the radar would have shown the pontoon line, his failure to use the radar was gross negligence. Afran Transport Company v. M/T Bergechief, 274 F.2d 469 (2 Cir. 1960); White Stack Towing Corporation v. Bethlehem Steel Company, 279 F.2d 419, 82 A.L.R.2d 757 (4 Cir. 1960); Continental Oil Co. v. M/S Glenville, 210 F.Supp. 865 (S.D.Tex.1962); Placid Oil Company v. S. S. Willowpool, 214 F.Supp. 449 (E.D.Tex.1963); Villain & Fassio, etc. v. T/S E. W. Sinclair, 207 F.Supp. 700, n. 1 (S.D.N.Y.1962), affirmed per curiam, 313 F.2d 722 (2 Cir. 1963), cert. den., 373 U.S. 948, 83 S.Ct. 1678, 10 L.Ed.2d 704 (1963).

(c) He did not give the long blast required by Pilot Rule 80.26(a), 33 CFR 80.26(a)[3] and slow down until he received a signal from the dredge as to the side on which he should pass.[4] Because of the wind, the dredge might not have heard a long blast from the Syra, if one had been given. Nevertheless, a signal was given by the dredge, when the Syra was some 600 or 700 ft. astern, indicating that the Syra should pass to the left of the dredge, i. e., that she should pass the dredge on the starboard side of the Syra.

(d) If the Syra had had a bow lookout, as she should have had, the bow lookout might well have heard the dredge's whistle, which was inaudible in the wheelhouse and on the flying bridge, 300 ft. from the bow. A lookout at the bow might also have seen the steam from the whistle or the whistle lights, which neither Davis nor anyone else on the bridge noticed. A bow lookout might have seen the pontoon line well before the pilot, who admitted that visibility from the bridge was not good. Anthony v. International Paper Co., 289 F.2d 574 (4 Cir. 1961), and cases cited therein.

■ The pilot must have seen the pipeline on his way down the Bay on December 28, even though he may not have noticed the position of Buoy 4M at that time. Under all the circumstances he was grossly negligent in attempting to run by the dredge even at the modest speed of 4 or 5 knots without taking proper and available steps to determine where the dredge was lying with respect to the channel and where the pontoon line ran.

■ The Syra and the pilot seek to place the blame on the United States, for placing the buoy in a misleading position and not giving more warning that it had been moved. The position of the buoy was certainly misleading, and since the printed notice to mariners which included notice of its new position was not mailed out until Friday, December 28, the government should have given more frequent radio notices than it did. Whether the failure of the United States amounts to actionable negligence entitling a person or a vessel to recover damages or indemnity from the government

3. " § 80.26 Passing signals.
"(a) Vessels intending to pass dredges or other types of floating plant working on navigable channels, when within a reasonable distance therefrom and not in any case over a mile, shall indicate such intention by one long blast of the whistle, and shall be directed to the proper side for passage by the sounding, by the dredge or other floating plant, of the signal prescribed in the local pilot rules for vessels under way and approaching each other from opposite directions, which shall be answered in the usual manner by the approaching vessel. If the channel is not clear, the floating plant shall sound the alarm or danger signal and the approaching vessel shall slow down or stop and await further signal from the plant."

4. Instead of obeying Rule 80.26(a), the pilot gave one short blast to indicate that he was going to pass on the right of the dredge.

cannot be decided *in vacuo*, but only by considering whether such person or those in charge of the vessel had reasonable means for acquiring information about the repositioning of the buoy and a duty to use those means. If we were dealing with a pleasure boat, whose skipper would normally be ashore on Christmas Eve and Christmas Day, the failure to give radio notice at any time other than those two days would probably be actionable negligence. But we are dealing in this case with a pilot and a vessel under the conn of a pilot. The pilot was a member of an association which maintains a pilot boat equipped to receive such messages and with a duty to receive and to post or otherwise advise pilots of all such messages. There is no evidence that such a message was not received and posted by those in charge of the pilot boat at the Capes. The pilot had a duty to keep himself informed, including a duty to check all posted notices on the pilot boat. He did not testify what he had done to keep himself informed. Particularly, he did not testify that he had checked any posted notices on the pilot boat. The duties of a pilot are set out in Atlee v. Packet Co., 88 U.S. 389, 22 L.Ed. 619 (1874); Great Lakes Towing Co. v. Alva S. S. Co., 261 F. 261 (7 Cir. 1919); Essex County Electric Company v. M/S Godafoss, 129 F.Supp. 657 (D. Mass.1955) (opinion by Aldrich, J.); McDonald v. The Tom Lysle, 48 F. 690 (W. D.Pa.1891). The failure of a ship captain to avail himself of information in a printed notice to mariners was considered a "glaring fault" in Continental Oil Company v. M/S Glenville, supra, 210 F. Supp. at 870, and cases therein. The same principles apply here to prevent the pilot and the Syra from shifting any part of their faults to the United States.

Nor can the pilot and the Syra shift any part of the blame to the dredge or its owner. The crew of the dredge did all that could reasonably have been expected of them to keep lights burning

on the pontoon lines. The dredge gave the proper signal to the Syra. Whether and when it should have blown a danger signal is debatable; certainly respondents have not shown that such a signal would have been heard and heeded in time to have prevented the damage to the pontoon line.

The full liability for the damage to libelant's pontoon pipeline should be placed on the Syra and her pilot.

Counsel will prepare and agree upon an appropriate decree.[5]

---

5. At the request of the parties, the Court decided the amount of the damages two years ago, in the hope, which proved futile, that the parties would be able to settle the case after the amount of damages had been fixed.